**UNITED STATES of America, Appellee,**

v.

**Steven V. HERSHENOW, Stuart M. Rosenthal, Steven A. Shraiar, Defendants-Appellants.**

**Nos. 81–1363 to 81–1365.**

United States Court of Appeals, First Circuit.

Argued March 4, 1982.

Decided June 11, 1982.

As Modified on Denial of Rehearing and Rehearing In Banc Sept. 14, 1982.

Jeanne Baker, Cambridge, Mass., with whom Stephanie A. Cleverdon, and Baker & Fine, Cambridge, Mass., were on brief, for defendant, appellant, Steven V. Hershenow.

Richard M. Egbert, Boston, Mass., with whom Marcus & Egbert, Boston, Mass., was on brief, for defendant, appellant, Stuart M. Rosenthal.

Richard H. Gens, West Newton, Mass., for defendant, appellant, Steven A. Shraiar.

Michael A. Collora, Sp. Asst. U. S. Atty., Boston, Mass., with whom William F. Weld, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Defendants-appellants appeal their convictions of multiple counts of mail fraud in violation of 18 U.S.C. § 1341. Steven Hershenow, a medical doctor, Stuart Rosenthal, a chiropractor, and Steven Shraiar, a pharmacist, were found guilty of ten counts, eleven counts, and eight counts respectively of violations arising out of a scheme to defraud insurance companies from 1975 to 1980 by submitting false or inflated bills for services to persons involved in automobile accidents.

The essence of the scheme was as follows. Certain Boston-area attorneys would refer individuals with relatively minor injuries from automobile accidents to either Hershenow or Rosenthal, each of whom frequently would then refer the patients to the other. The patients would be seen by each doctor only two or three times but would be billed for many more visits, occasionally as many as twenty. These patients were also referred by the doctors to the Beaconsfield Pharmacy, owned by Shraiar, to purchase surgical equipment such as braces and whirlpools. Just as the Hershenow and Rosenthal bills reflected nonexistent visits, so did the pharmacy bills reflect nonexistent purchases.

The defendants' bills would be sent to the attorneys who had made the initial referrals, who would then submit them to the insurance companies for payment. The inflated billing was designed to exceed the $500 threshold under the Massachusetts "no-fault" statute; where medical expenses exceed $500 an automobile accident victim can sue the other party to the accident for negligence and recover damages for pain and suffering. See Mass.Gen.Laws, Ann. ch. 231, § 6D.

According to Hershenow's former secretaries, who testified for the government, his appointment book at the office reception desk and the patients' file records accurately reflected the number of office visits by patients. With regard to accident patients, however, the secretaries found substantial discrepancies between these records and the bills drawn up by Hershenow. As an example, one accident patient file identified by a secretary showed two office visits according to the patient's medical record but a bill made out by Hershenow for sixteen visits.

Rosenthal's former secretary observed similar instances of overbilling. An appointment book was kept which accurately reflected patients' office visits. But the front of accident patients' charts and a separate billing or "logging" book showed far more visits for these patients than had actually occurred. Secretaries for both doctors observed numerous false billing dates recorded in the doctors' handwriting.

Shraiar's role in the scheme was evidenced primarily through the testimony of accident patients who, when shown bills submitted on their behalf for equipment ostensibly purchased at Beaconsfield Pharmacy, testified that the bills were false. Some of the witnesses stated they had not received all the equipment listed. Some had never been to the pharmacy at all.

Appellants raise numerous issues in this appeal; the significant ones are considered seriatim.

*The Search Warrants*

Both Hershenow and Rosenthal claim that the district court erred in denying their pretrial motions to suppress documentary evidence seized from their medical offices pursuant to search warrants.

The Hershenow warrant authorized a search and seizure of

> appointment books for the period January 1, 1976 to December 31, 1979; all accident patient files together with related manilla folders containing accident patient history forms, charge cards, bills and correspondence relating to accident patient files, active and inactive, for the years 1976–1979; and a rubber "Office Exam" hand stamp; which constitute evidence of violations of Title 18, United States Code, Section 1341.

Hershenow contends that the warrant description "accident patient files" is insufficiently particular and exceeds the scope of the probable cause established by the underlying affidavit. He argues that the fo-

cus of the investigation as shown by the affidavit was on fraud relative to automobile accident patients and that the warrant should have been so limited.

The fourth amendment requirement that a search warrant "particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927).

In *United States v. Abrams*, 615 F.2d 541 (1st Cir. 1980), we held invalid for lack of particularity a warrant authorizing the seizure from a doctor's office of "certain business and billing and medical records of patients ... which show actual medical services performed and fraudulent services claimed to have been performed in a scheme to defraud the United States and to submit false medicare and medicaid claims for payments to the United States...." Besides lacking a time limitation, the warrant contained no description of what specific records the executing officers were to seize. Without such guidance, the officers took all of the Medicare-medicaid records they found. Although on the facts of *Abrams* we found the warrant description infirm as overly general, we did suggest that if the affidavit information had established probable cause for the seizure of all the Medicare-medicaid records on the premises, a warrant authorizing seizure of all such records would not be invalid. *Id.* at 544 & n.7.

Similarly, in *In re Application of Lafayette Academy*, 610 F.2d 1 (1st Cir. 1979), we struck down a warrant that authorized the seizure of virtually "every sort of book or paper at the described premises," *id.* at 3, where the underlying affidavit established probable cause to believe only that fraud was being committed with regard to the school's participation in the Federal Insured Student Loan Program. Although our decision was based on a finding of insufficient particularity in the description of things to

be seized, we noted that "it could be argued that as the above description authorizes in effect the search and seizure of *all* books, papers, etc., the warrant does not suffer from a lack of particularity. The directions to the executing officer are straightforward—he is to cart away all documents." *Id.* at 5 (emphasis original). The problem with that interpretation, we said, was that the underlying affidavit did not establish probable cause to search and seize everything.

The particularity and probable cause requirements of the fourth amendment are thus closely interconnected, as the Supreme Court has recognized in interpreting the pertinent language of the amendment: "'and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' This prevents the issue of warrants on loose, vague or doubtful bases of fact." *Go-Bart Co. v. United States*, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374 (1931).

The Hershenow warrant authorizes the seizure of "all accident patient files" within a limited time period. On its face, nothing is left to the discretion of the executing officers—they are to take all files pertaining to patients involved in accidents. The warrant description, therefore, is sufficiently particular as long as the underlying affidavit established probable cause to believe that fraud was being committed in Hershenow's entire accident practice.

The affidavit, prepared by Postal Inspector John Dunn, focuses primarily on an investigation into fraud concerning automobile accident insurance. At the outset, it is stated that the insurance company representatives chose certain files for Dunn's investigation "based upon the excessive amount of medical treatment afforded, i.e.: physician, chiropractor, radiologist, etc., for largely minor car accidents where any injuries appear to have been negligible or highly unlikely." The company representatives believed that this excessive amount of treatment was being fraudulently geared

towards exceeding the $500 "no-fault" limit in Massachusetts relating to motor vehicle accidents. Most of the remainder of the thirteen-page affidavit is based on the observations of secretaries working for Hershenow from 1973 to 1980. Each described her direct observation of bills prepared and sent out by Hershenow for *accident* patients reflecting visits that had not occurred; the statements were not confined to automobile accident patients. For example Ellen Steinberg, employed from 1973 to 1978, estimated that from 1975 until November 1978, when she left Hershenow's employ, 95% of the bills "for accident patients (primarily involving automobiles) contained bills for non-existent visits." Terry Carter, an employee in 1978, became aware of fictitious billing for accident patients several months after she began working for Hershenow. She compared his 1978 appointment book, which showed actual patient visits, with the dates billed in approximately one-third of the current accident patient files. She discovered that with few exceptions there were no subsequent visits marked in the appointment book for accident patients after their initial visits. Although "accident patients" were referred to frequently by the employees without qualification, when on occasion they specified a type of accident, it was only automobile accidents.

■■■ There is no question that the affidavit on its face established probable cause for the search and seizure of all of Hershenow's automobile accident files, as his counsel conceded at oral argument. But the magistrate is entitled to go beyond the averred facts and draw upon common sense in making reasonable inferences from those facts. *United States v. Drake*, 673 F.2d 15 at 18 (1st Cir. 1982); *Rosencranz v. United States*, 356 F.2d 310, 314 (1st Cir. 1966). The issue is whether the affidavit facts reasonably support an inference that Hershenow's fraudulent activity probably encompassed his entire accident practice. We review the pertinent averments to determine the reasonableness of the inference.

At the start of the affidavit, Dunn stated that he had been investigating schemes to defraud insurance companies through the submission of fraudulent medical reports and bills "in support of personal injury liability claims." Ellen Steinberg reported that Hershenow had a "general practice handling a large percentage of patients involved in personal injury liability claims resulting primarily from automobile accidents." She also stated that "95% of the bills of Dr. Hershenow for *accident* patients (*primarily involving automobiles*) contained bills for non-existent visits." (Emphasis added). This last statement standing alone gives rise to the inference that all of Hershenow's accident practice probably involved fraud. In addition, there are the bills appended to the affidavit as exhibits, indicating that Hershenow was a doctor of internal medicine, a fact which makes his having an accident practice of any type unusual. We conclude that a common sense reading of the affidavit supports the inference of the probability of fraud throughout all of Hershenow's accident practice.

■ Because the affidavit establishes probable cause to seize all accident patient files, the warrant, which is confined to seizure of those materials, is sufficiently particular. This case is different from the situation in *United States v. Roche*, 614 F.2d 6 (1st Cir. 1980), which Hershenow seeks to liken to his own. There, a search warrant authorized the seizure from an insurance agency office of virtually all insurance records and documents, but the affidavit established probable cause to believe only that the agency was engaged in fraud dealing with automobile insurance. The result of the overly broad warrant in *Roche* was that all the documents on the premises were subject to seizure without either probable cause or guidelines to circumscribe the executing officers' discretion. Here, by contrast, where the warrant description did not extend beyond the foundation of probable cause, all of the described documents were properly seizable and a more limited description was unnecessary.

Hershenow's reliance on our decision in the *Abrams* case is equally misplaced. The problem addressed in *Abrams* was how the executing officers were to determine *which* Medicare-medicaid files to take, since there was no probable cause to seize all of them. As we suggested in *Abrams*, however, if there had been probable cause as to the entire class, the warrant could have authorized the seizure of all the records in that class. That is the present case.

We also reject Hershenow's argument that there was no probable cause for the seizure of entire files because it was in connection with billing practices that fraud had been alleged. The affidavit states that the reviewed insurance files were chosen "based upon the excessive amount of medical treatment afforded . . . where any injuries appear to have been negligible or highly unlikely." The exhibits appended to the affidavit contain letters to accident patients' attorneys stating the nature of the injuries and indicating that follow-up medical reports would be sent "when indicated." It was therefore necessary to look not only at the billing information but also to see the patient's diagnosis, prognosis, and nature of treatment prescribed in order to get a complete picture of the patient's case. The warrant properly authorized seizure of these files in their entirety.

Turning to Rosenthal, he also complains that the three warrants authorizing seizure of, *inter alia*, all accident patient files from his office are invalid for lack of particularity and probable cause.[1] The supporting affidavits, also prepared by Postal Inspector Dunn, contain information obtained from former employees of Rosenthal. One former secretary stated that the vast majority of Rosenthal's practice was comprised of automobile accident patients. Another in-

dicated that his accident practice had expanded during her tenure to 80% of his total practice. Both described, as did other former employees, billing practices similar to those of Hershenow whereby fictitious visits were added by the doctor to the records of accident patients.

For the reasons already discussed, we conclude that the description "all accident patient files" is sufficiently particular in light of the foundation of probable cause for seizure of all the materials within that class.

Rosenthal also attacks the first warrant for lack of probable cause to find that the files were at his office due to the staleness of the affidavit information. The affidavit, dated February 11, 1980, was based on information supplied by former employees; the most recently employed, Marion Re, had not worked for Rosenthal since the end of March 1979. She stated that appointment books for prior years were retained in a closet and that inactive files were kept in the basement. In addition, she reported that she had visited the doctor's office in December 1979 and, at that time, to the best of her knowledge, the file cabinets containing accident patient files were still intact.

Whether or not the averments in an affidavit are sufficiently timely to establish probable cause depends on the particular circumstances of the case. *United States v. DiMuro*, 540 F.2d 503, 516 (1st Cir. 1976). Where the information points to illegal activity of a continuous nature, the passage of several months between the observations in the affidavit and issuance of the warrant will not render the information stale. *Id.* The Supreme Court in *Andresen v. Maryland*, 427 U.S. 463, 478-79 n.9, 96

---

1. The first warrant authorized seizure from his medical office of "(1) appointment books for the period January 1, 1976, to December 31, 1979, and (2) all accident patient files . . . for which billings have been made for the period January 1, 1976, to March 31, 1979 . . . ." The affidavit for this warrant was based on information supplied to Dunn by Rosenthal's secretaries employed during this period. The second warrant authorized seizure of accident files

for which billings have been made for the period April 1, 1979, to January 1, 1980 . . . ." The supporting affidavit repeats the averments of the first and contains Dunn's own observations based on his analysis of the appointment books already seized. The third warrant authorized the seizure of accident patient files for the years 1976 through 1979 from a rental storage facility. Rosenthal appears to address his arguments to the first warrant only.

S.Ct. 2737, 2747–48 n.9, 49 L.Ed.2d 627 (1976), noted that a three-month delay was not too long where the materials sought were business records prepared in the ordinary course of the defendant's law practice or his real estate company and where other facts supported a belief that he retained the records.

■ The affidavit facts amply support probable cause to believe that Rosenthal maintained his accident patient records and appointment books at his office. Appended to the Rosenthal affidavit was the affidavit supporting the Hershenow warrant, in which a current Hershenow secretary, employed throughout 1979, reported that accident patients were referred to Hershenow by Rosenthal. This supported a belief in the probability of a continuing violation. Moreover, it was specifically stated in the Rosenthal affidavit that inactive files and old appointment books were kept at the office. Where the scheme was thus a continuing one and there was information pointing to the doctor's regular practice of retaining his records, it was reasonable for the magistrate to conclude that probable cause existed on February 11, 1980, for believing that the sought-after records would be found at Rosenthal's office.[2]

*The Lindsay Subpoena*

The next issue raised by Hershenow is whether the district court erred in denying his motion to suppress the contents of a cardboard box belonging to him. Hershenow argues that the search of the box violated his fourth amendment rights and the seizure of its contents violated his fifth amendment right against incrimination. The facts bearing on these issues, largely undisputed, are found in the record of the pretrial suppression motion.

In February of 1980, shortly after the execution of the search warrant at his office, Hershenow took a sealed cardboard box to St. Monica's Nursing Home. He had been medical consultant to the home since about 1960; he received an annual salary for his services, which included consultation and, when necessary, personal visits to the patients at the home. Hershenow asked Nelson Crawford, the home's maintenance man, to store the box for him in the barn, which was separate from the main building, saying: "Put this in the barn and keep it." The barn was used for storage of miscellaneous equipment, supplies and lawnmowers. Crawford, the administrator of the home, and four or five nuns had access to the barn by use of a key which hung on a door. Crawford put the box in a clothes hamper on top of bedspreads in an area of the barn not considered a storage area.

In June 1980, one of the nuns who worked at the home, Sister Rosemary, told Donald Lindsay, administrator of St. Monica's, that there was a box in the barn that he ought to look at. Lindsay found the box in a laundry bin buried beneath bedspreads in an area of the barn in which anything other than laundry would be discarded as rubbish. The box was sealed with tape, had a shipping label on it addressed to Hershenow and markings indicating that it contained, or had at one time contained, electronic equipment. Lindsay brought the box into the administration building and noticed that it also had the name of the home's director of nurses, Pangborn, scribbled on top. He opened the box and saw that it contained patient records, which he examined to the extent necessary to determine that none of the records pertained to residents at St. Monica's. His examination disclosed that the records related to patients who may have been involved in an "injury situation." Lindsay was sure that the records belonged to Hershenow because his name was on the box and the records were in his handwriting. Lindsay then called an unidentified administrator of

---

**2.** Rosenthal makes the additional claim that the inclusion of the Hershenow warrant in the underlying affidavit deprived the magistrate of the requisite neutrality in issuing warrants. He cites no authority for this proposition nor have we found any. The scheme under investigation involved the participation of another individual—Hershenow—engaged in similar conduct and the close professional relationship of the two doctors had been averred. We can see no reason to deny the magistrate access to this highly relevant information.

another nursing home for advice and related his findings.

Shortly thereafter, Postal Inspector Dunn learned from another doctor, a former associate of Hershenow, that material relevant to Hershenow's case was at St. Monica's. Dunn then telephoned Lindsay and ascertained that a box containing patient records belonging to Hershenow was at the home. He promptly, the same day, went to St. Monica's. Based on Lindsay's representations—that Hershenow had no storage rights at the home, that the barn was not a secure place, that the box was inadvertently found in a laundry bin covered with bedspreads—Dunn believed the box had been abandoned. He looked through the records in the box and saw patient files and the 1978 appointment books that were missing during his January search of Hershenow's office. This is the warrantless search which defendant claims violated his fourth amendment rights. Although Dunn considered taking the box at that time, he decided to wait until a grand jury subpoena *duces tecum* was obtained and served on Lindsay as custodian of the records. This was done with alacrity and the box was taken away. This is the seizure which Hershenow alleges violated his fifth amendment privilege against self-incrimination.

In denying the motion to suppress, the district court found that the defendant had abandoned the box of records and had no reasonable expectation of privacy in its contents "once they were stashed in the barn." The court further found that the records were not in Hershenow's actual or constructive possession when seized pursuant to the subpoena and that, therefore, his fifth amendment privilege was not implicated. We affirm.

■ The basic question is whether, under these facts, Hershenow had a reasonable expectation of privacy in the box and its contents when it was searched. The concept of a fourth amendment right to a reasonable expectation of privacy that protects people, not places, was, after a long period of gestation, given judicial birth in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), the Court, adopting Mr. Justice Harlan's *Katz* concurrence, set forth a two-step test for determining whether there was a reasonable expectation of privacy: whether the individual has exhibited a subjective expectation of privacy; and whether such subjective expectation, viewed objectively, is "justifiable" under the circumstances. *Id.* at 740. The burden is on the defendant to "establish not only that he had a real, subjective expectation of privacy ..., but that this expectation, viewed objectively, was reasonable." *United States v. Goshorn,* 628 F.2d 697, 700 (1st Cir. 1980).

■ Hershenow passes the subjective expectation test easily. It seems clear that his purpose in taking the box to St. Monica's shortly after the search warrant was executed at his office was to hide it and its incriminating contents. But a legitimate expectation of privacy means more than a subjective expectation of keeping incriminating evidence hidden. *See Rakas v. Illinois,* 439 U.S. 128, 143–44 n.12, 99 S.Ct. 421, 430 n.12, 58 L.Ed.2d 387 (1978). We therefore, turn to the objective test. The following factors weigh against an objective expectation of privacy: Hershenow did not know the location of the box except that it was somewhere in the barn (if Crawford had followed his instructions); Hershenow did not have regular access to the barn; at least four months had passed since Hershenow had turned the box over to Crawford, and there is nothing in the record to indicate that Hershenow had inquired about the box during that time or had done anything to assert control over it; and, most important, Hershenow had no right of control over the locus of the box.

The countervailing factors are that the box was sealed and had Hershenow's name on it.

On balance, we find that there was no objective, justifiable expectation of privacy. One cannot insulate himself against the discovery of incriminating material by removing it from his own premises, where there is a likelihood of a warrant-authorized search, and hiding it in a place as unoriented to security as a barn in which one has no legal interest or even access rights.

We need not decide whether, as the district court found, Hershenow abandoned the box. "[W]e are not convinced that the property law analysis of abandonment ought to be applied where the issue is a reasonable expectation of privacy." *United States v. Miller*, 589 F.2d 1117, 1131 (1st Cir. 1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979). Moreover, the traditional property concepts relative to abandonment do not apply in a search and seizure setting; "the question is whether the defendant has, in discarding the property, relinquished his reasonable expectation of privacy so that its seizure and search is reasonable within the limits of the Fourth Amendment." *United States v. Brown*, 663 F.2d 229, 232 (D.C. Cir. 1981) (quoting *City of St. Paul v. Vaughn*, 306 Minn. 337, 237 N.W.2d 365 (1975)); *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973).

In our prior opinion we stated that Hershenow's "lack of a legitimate expectation of privacy in the storage place did not deprive him of a reasonable expectation of privacy in his own storage container." *United States v. Hershenow, et al.*, No. 81–1363, slip op. at 13 (June 11, 1982), citing to *Robbins v. California*, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), and *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). These cases have now been overruled by *United States v. Ross*, —— U.S. ——, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), which held that sealed containers were no longer exempt from a warrantless probable cause search of an automobile.

Our original opinion held that the prior coextensive private search by Lindsay destroyed the defendant's legitimate expectation of privacy in the contents of the box. We withdraw that holding.

■■■■ It follows that because the records were neither in Hershenow's actual or constructive possession at the time of the search or when the subpoena was served on the third party the fifth amendment could not be used as a basis for suppression of the documents.[3] The Supreme Court in *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), made clear that the fifth amendment privilege against self-incrimination as it relates to the seizure of a person's records is concerned with "protections against governmental *compulsions* upon the *individual accused* of crime." *Id.* at 333, 93 S.Ct. at 618 (emphasis added). Thus, possession or constructive possession of the papers by the person asserting the privilege is necessary before the privilege may be invoked. *In re Grand Jury Proceedings United States*, 626 F.2d 1051, 1054 (1st Cir. 1980). Where constructive possession is claimed, it must be "so clear . . . as to leave the personal compulsions upon the accused substantially intact." *Couch v. United States*, 409 U.S. at 333, 93 S.Ct. at 618.

Hershenow argues that the seized records were in his constructive possession because he had placed them in the hands of another merely for custodial safekeeping. He points to decisions in other circuits in which the courts made a distinction between third-party possession where that party was intended to make use of the documents and have knowledge of their contents and third-party possession where the owner merely

---

**3.** In light of our holding that there was no search of the box within the fourth amendment, we have no need to address the argument that the subpoena was the fruit of an illegal search.

arranged for custody of the records in a bailee and retained the right to immediate possession. *See, e.g., United States v. Jones,* 630 F.2d 1073 (5th Cir. 1980). It is in the latter situation that constructive possession has been recognized and which Hershenow contends is the case here.

█ . The first problem with Hershenow's claim is that the individual to whom the subpoena was addressed—the administrator Lindsay—was not the third party with whom he left the records for "custodial safekeeping." Although Hershenow may not have intended Lindsay or anyone else at St. Monica's to have knowledge of the contents of the box, he left it in a place where it was reasonably foreseeable that it would be discovered. He did not obtain permission to store it from Lindsay, the only person with the authority to consent to custodial safekeeping on the premises. Hershenow cannot seriously contend that his actions in "entrusting" the box with Crawford are analogous to placing records in a safe at the offices of a corporation that did not have knowledge of the safe's combination, *United ed States v. Guterma,* 272 F.2d 344 (2d Cir. 1959), or to placing them in a safety deposit box, *Couch v. United States,* 409 U.S. at 337, 93 S.Ct. at 620 (Brennan, J., concurring). When he deposited the box with Crawford under such casual circumstances, Hershenow effectively relinquished his control over it and its contents vis-a-vis any other private parties who could gain access to it.[4] His claim of constructive possession is without substance.

█ Finally, Hershenow's fifth amendment argument must fail because he was not the object of any personal compulsion,

*Couch v. United States, supra;* he was not required to do anything to facilitate the seizure. *See In re Horowitz,* 482 F.2d 72, 87 n.20 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973).

*Opening Statement*

Rosenthal claims the district court erred in refusing to allow him to make an opening statement to the jury.[5] Prior to the commencement of the trial, the following colloquy occurred at the bench:

Mr. Gens [counsel for Shraiar]: One question: Will defense counsel be allowed to open after the prosecution?

The Court: No, they open if they call witnesses. I have had too many criminal cases where they opened and did not call anyone, which means they have a free argument.

Hershenow's counsel then represented to the court that his case would come in through cross-examination of the government's witnesses and that he believed he was entitled to alert the jury to his theory in advance. The court then stated, "My experience is that in a criminal case the government makes its opening and when the government rests anyone who is going to call a witness *or introduce evidence* makes their opening and I will stay with that policy in this case." (Emphasis added). Rosenthal echoed Hershenow's objection.

█ The purpose of an opening statement "is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony

---

**4.** Hershenow's reliance on *In re Grand Jury Subpoena,* 646 F.2d 963 (5th Cir. 1981), is misplaced. There, the court held an employer could invoke the privilege where a subpoena was addressed to an employee-comptroller with access to business records but without possession, custody or control over them. Not only was Lindsay not Hershenow's employee but he in fact had possession, custody and control over the box of records at the time the subpoena was served.

**5.** Both Hershenow and Rosenthal were denied opening statements and both raised this issue on appeal. Although only Rosenthal argued the issue in his brief, Hershenow relied on it pursuant to Fed.R.App. 28(i).

to the whole[.]" *United States v. Dinitz*, 424 U.S. 600, 612, 96 S.Ct. 1075, 1082, 47 L.Ed.2d 267 (Burger, C. J., concurring). *See United States v. Freeman*, 514 F.2d 1184, 1192 (10th Cir. 1975). The scope and extent of an opening is within the control of the trial court, *United States v. Freeman, supra*, as is the timing of the defendant's opening, *United States v. Conti*, 361 F.2d 153, 158 (2d Cir. 1966), *vacated on other grounds*, 390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035 (1968).

Although we have found no federal case directly dealing with a criminal defendant's right to make an opening statement,[6] such a right appears to be presumed, at least in the Ninth Circuit. In a case where defense counsel had been found in contempt for repeated inflammatory remarks in his opening statement, the court noted, "Appellant says he had a right to make an opening statement. Of course he had, so long and to the extent it remained within the bounds of propriety and good faith." *Hallinan v. United States*, 182 F.2d 880, 885 (9th Cir. 1950), *cert. denied*, 341 U.S. 952, 71 S.Ct. 1010, 95 L.Ed. 1375 (1951). In *United States v. Breedlove*, 576 F.2d 57 (5th Cir. 1978), the trial judge's failure to allow defense counsel to make an opening statement at the end of the government's case, after having previously granted permission to counsel to reserve it until then, was held to be error, albeit harmless. The appeals court noted the lack of prejudice to the defendant in that he called only one witness whose testimony was not complicated and made his closing argument the following day, with the opportunity to say at that time whatever he would have said in an opening the day before. The court did state, however, that "[h]ad appellants been denied the right to make an opening prior to the government's case . . . we might be faced with a different situation." *Id.* at 60. It is this situation that we face.

■ We believe it was error not to permit the defendant to make an opening statement. "The function of the defendant's opening statement is to enable him to inform the court and jury what he expects to prove. . . ." *United States v. Freeman*, 514 F.2d at 1192. The importance of this function is not diminished by the fact that the defendant expects to prove his defense theory through cross-examination of the government's witnesses, witnesses that he himself would otherwise have called. This was not a case where cross-examination would have been confined to attempts at impeachment. As counsel indicated to the court, the defense had interviewed the prosecution's witnesses, particularly the employees of the defendants. The defense was therefore reasonably certain what the government would seek to prove in its direct examination and what testimony it would be able to elicit on cross-examination.

There are cases, of course, where a defendant's opening statement would be merely a prelude to his argument. In his brief, defendant flirts with a concept of argument, and we suspect that this very possibility and past experience influenced the court's decision. However, a court is always free to stop argument if it occurs, and we now rule that, provided he confines himself to a discussion of what he hopes to show, a defendant in a criminal case has a right to make an opening regardless of whether he intends to call witnesses, and may do so immediately after the prosecutor's opening, absent good cause shown to the contrary.

■ Based on the record in this case, however, we conclude that Rosenthal was not prejudiced by the denial of an opening

---

6. The District of Columbia Court of Appeals in *Hampton v. United States*, 269 A.2d 441 (D.C. 1970), has expressly held that a criminal defendant tried by a jury has the right to make an opening statement. *Hampton* involved the denial to defense counsel of the right to reserve his opening until after the government's case.

The D.C. Circuit has also held, without explicitly finding a right to make an opening, that defense counsel was within his rights in obtaining permission to withhold his opening until the government rested. *Karikas v. United States*, 296 F.2d 434 (D.C.Cir.1961), *cert. denied*, 372 U.S. 919, 83 S.Ct. 731, 9 L.Ed.2d 724 (1963).

statement.[7] He argues on appeal that had he been permitted an opening he would have told the jury that he was not guilty of committing fraud but rather that the mistakes in billing were due to sloppy bookkeeping and an extremely busy practice. He would have promised to show, through the government's witnesses, that it was common chiropractic practice to send patients for X-rays and to a medical doctor for prescriptions for medication and that, therefore, the bills for these services were not excessive.

We do not view Rosenthal's defense as a new or complicated theory that the jury might overlook or find difficult to understand without advance elucidation. Rather, it was more a straightforward denial of the government's case. The government's opening was simple and short and defendant's evidentiary answer, or attempted answer, quite predictable.

Although we disapprove of the trial court's refusal to permit the defendants to make opening statements, we are satisfied that the jury was adequately apprised of Rosenthal's theory of the case through his cross-examination of these witnesses. The testimony was not complicated and it served as the basis for an able closing argument in which counsel stressed that the evidence allowed for an innocent explanation of the doctor's practices. In the absence of prejudice we do not find reversible error.

*Jury Charge on Unsubmitted Counts*

Rosenthal claims[8] that the trial court committed reversible error in its handling of the counts in the indictment that were not submitted to the jury. He argues that the following language at the opening of the court's charge to the jury deprived him of his right to have his case decided only on evidence the jury actually heard:

Now, as you all know, this case began with the return of an indictment. The indictment as returned contained 32 [*sic*] counts. Before the trial began I instructed all the lawyers that I wanted the trial to proceed on a lesser number of counts and I gave them some specific instructions about that. Accordingly, and in line with what I told the lawyers, I have withdrawn from your consideration many of the counts which were contained in the 32 [*sic*] counts returned[.]

Although from the record it appears that this statement is not an accurate representation of what actually occurred regarding the unsubmitted counts, we find that, if this was error, it was harmless.

Each of the counts in the indictment related to a separate accident patient on whose behalf bills were submitted to insurance companies. Evidence as to only twelve counts relating to Rosenthal was presented at trial. At a bench conference prior to the court's charge, Rosenthal's counsel moved for a judgment of acquittal on all counts. As to the twelve that would be submitted to the jury, the motion was denied and the court reserved ruling on the other counts on which the government had introduced no evidence. Rosenthal's counsel then asked for clarification regarding how the jury would be instructed on the unsubmitted counts. The judge stated:

I just tell the jury I am letting a certain number of counts go to the jury, that I have withdrawn the others from their consideration, and that is my usual practice.

Any time I either direct or tell the government not to put in evidence the jury only knows they are getting the following counts and the rest have been withdrawn from their consideration.

See generally *United States v. Flannery*, 451 F.2d 880 (1st Cir. 1971); *Desmond v. United States*, 345 F.2d 225 (1st Cir. 1965) (prosecutor's comment that government's evidence uncontradicted reversible error where contradiction would have required defendant to take stand).

**8.** Hershenow also raises this issue on appeal, relying on Rosenthal's brief.

---

**7.** Rosenthal also claims that the denial amounted to a violation of his fifth amendment privilege not to testify because it constituted a penalty against him for not putting on a defense. But the record indicates that he was not the sole possible witness for his defense; there were several other of his former employees who were not called by the government. There was no hint of a constitutional violation here.

There is nothing in the record to indicate that prior to trial the court ordered the government to reduce the number of counts on which it would proceed. It would appear from the witness list provided to defendants by the government before trial that the government expected to go forward on each count.[9] Although the statement to the jury was not entirely accurate, it was not out of harmony with what the court had said at the bench conference, that the jury would understand that the *court* had withdrawn the unsubmitted counts.

Rosenthal argues that the only effect the court's statement to the jurors could have had was to impress upon them that but for time constraints there would have been even more evidence of guilt presented to them at trial, thus inviting them to consider evidence not before them. We do not agree that this is the inevitable interpretation to be given the court's words.

In a similar case, *United States v. Aronson*, 319 F.2d 48 (2d Cir.), *cert. denied*, 375 U.S. 920, 84 S.Ct. 264, 11 L.Ed.2d 164 (1963), the defendants were tried on a third-count indictment for mail fraud involving the purchase of stock in three separate companies. The government presented evidence on only three counts, relating to transactions in only one company's stock. The trial court commented in its charge, "In order to keep this case within reasonable bounds, the government has elected to present proof on only three of the counts, the first, the second and the 30th counts." *Id.* at 50. The defendants argued on appeal that the court's reference to limiting the trial to keep it "within reasonable bounds" called for an "inescapable inference" by the jury that the government had "an abundance of evidence as to the other twenty-seven counts which it withheld merely to shorten the trial." *Id.* Rejecting this argument, the court of appeals stated:

From the indictment itself, it must have been clear to the jury that the other counts related not to Great Western [the subject of the submitted counts] but to Mark, Inc. and Perry Oil, as to which no proof had been offered. The issues to be resolved were kept in clear focus by the court at all times. The fears now expressed of improper inferences by the jury as a result of the court's comments are unwarranted.

*Id.* at 50–51.

Here, the trial judge was careful to keep the issues before the jury in clear focus. The jury was instructed that it would take into the jury room a reduced version of the indictment, with the counts not to be considered physically removed from it. As to the fifteen counts submitted to the jury, the judge gave careful instructions regarding the duty to decide on separate verdicts for each defendant as to each separate count. The judge also told the jury that the evidence was limited to the testimony of the witnesses it had heard, exhibits admitted into evidence and facts stipulated to by counsel in open court. Certainly, the jury had to be told *something* about the fact that it would be considering fewer than the number of counts in the indictment. Although the court's statement may not have been technically accurate, we cannot see how Rosenthal was harmed by it.

*Appellant Shraiar*

We turn now to the issues raised by Shraiar, only two of which warrant discussion. First, he argues that his repeated motions below for severance should have been granted by the district court. He does not claim that the initial joinder under Federal Rule of Criminal Procedure 8(b) was improper but rather that severance pursuant to Federal Rule of Criminal Procedure 14[10] was required in order to prevent prejudice.

---

9. The prosecutor stated in his opening, however, that "[t]here are 31 counts in the indictment, but the government does not intend to present evidence on every one of those counts. So you will have something less than 31 by the time the deliberations occur."

10. The Rule provides in pertinent part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

A trial court's denial of a motion for severance will be overturned on appeal only if there has been an abuse of discretion. *United States v. Tashjian*, 660 F.2d 829, 834 (1st Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981). The burden is on the appellant to make a strong showing of prejudice from the denial. *United States v. Lochan*, 674 F.2d 960 at 967 (1st Cir. 1982); *United States v. Patterson*, 644 F.2d 890, 900 (1st Cir. 1981).

Shraiar claims the admission of highly prejudicial evidence against his co-defendants so prejudiced him as to require severance of his case. He points specifically to three files: patient records of Hershenow and Rosenthal [11] and an insurance company file, all of which involved Shraiar as the patient-claimant. The doctors' patient files relating to Shraiar as an automobile accident victim typified the pattern of billings for visits that did not actually occur. According to Hershenow's bills, Shraiar had visited the doctor six times, although the appointment book and medical record showed only one visit. The Rosenthal file on Shraiar showed at least one reported visit not appearing in the appointment book and one that appeared to have occurred while the doctor himself was totally disabled. The insurance file contained Shraiar's insurance claim and the supporting records of the doctors. Only the insurance file was admitted into evidence generally against all three defendants. The Hershenow and Rosenthal files were admitted only against the respective doctors.

We are not persuaded that the admission of the medical files prejudiced Shraiar.[12] Although they tended to link him in a fraudulent scheme with his co-defendants, there was other evidence to the same effect: there was testimony that he telephoned Hershenow's office occasionally, that he was friendly with Rosenthal, and that he visited Rosenthal's office on occasions that did not involve medical treatment. Moreover, the connection between Shraiar and the other defendants was established by the evidence that all of the customers whose Beaconsfield Pharmacy bills were false had been accident patients of the doctors.

Shraiar points to no other specific instances of prejudice arising from the joint trial. Although there was far more documentary evidence produced against the doctors, the live testimony against all three consisted of many of the same witnesses, accident patients billed for nonexistent doctors' visits and for nonexistent purchases from Shraiar's pharmacy. Throughout the trial the judge gave limiting instructions on

11. Although this evidence was objected to by Shraiar's counsel as hearsay and prejudicial, he did not request a limiting instruction. We have recently indicated that we will be reluctant to find reversible error in a denial of severance where counsel has failed to pursue the less drastic remedy of limiting instructions. *United States v. Lochan*, 674 F.2d at 969 (1st Cir. 1982).

12. Although Shraiar lumps the three evidentiary items together, the fact that the insurance file was admitted against him as well as his co-defendants makes it conceptually distinct and not the proper basis for a severance argument. The issue concerning the insurance file is whether it was admissible, which Shraiar argues it was not, claiming it and the doctors' files to be hearsay. Hearsay is an extrajudicial statement offered for the truth of the matter asserted. Fed.R.Evid. 801(c). But the "statements" of the doctors, i.e. the records of Shraiar's office visits contained in all three files, were introduced "simply to prove that the statements were made so as to establish a foundation for later showing, through other admissible evidence, that they were false." *Anderson v. United States*, 417 U.S. 211, 220, 94 S.Ct. 2253, 2260, 41 L.Ed.2d 20 (1974) (footnotes omitted). Similarly, Shraiar's insurance claim, contained in the insurance file, was entered into evidence merely to establish the fact of the submission of the claim. As such, these records were not hearsay. *Id.* & n.8; *United States v. Ciampaglia*, 628 F.2d 632, 643 (1st Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980); *United States v. Fox*, 613 F.2d 99, 100 (5th Cir. 1980); *United States v. Krohn*, 573 F.2d 1382, 1386 (10th Cir.), *cert. denied,* 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978). Through the introduction of the doctors' appointment books, containing an accurate account of patient visits and properly admissible under the business records exception to the hearsay rule, Fed.R.Evid. 803(6), the records were shown to be false.

the admissibility of evidence and was careful in his charge to instruct the jury as to its duty to give separate consideration to each defendant based on evidence relating only to that defendant. The fact that the jury acquitted Shraiar on two out of twelve counts and was unable to agree on a verdict as to two other counts demonstrates that it heeded the court's words and fulfilled its duty. *See United States v. Tashjian*, 660 F.2d at 834. In light of the record as a whole, we are satisfied that the district court did not abuse its discretion in denying the motions to sever.

Shraiar argues next that the evidence against him was insufficient to support the guilty verdicts returned by the jury on eight counts. We examine this claim mindful that we must view the evidence and all reasonable inferences therefrom in the light most favorable to the government. *United States v. Lochan*, at 966; *United States v. Indorato*, 628 F.2d 711, 719 (1st Cir.), cert. denied, 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980).

■ The evidence against Shraiar was comprised primarily of the testimony of his former business partner, Jerrold Lurie, and that of the accident patients on whose behalf bills were submitted by Shraiar for payment by the insurance companies. Lurie, a pharmacist, testified as follows. He and Shraiar had been partners in Beaconsfield Pharmacy and a surgical equipment business until 1979 when Lurie left. Lurie worked out front in the pharmacy servicing customers and Shraiar was in charge of all the bookkeeping and billing. They began selling surgical equipment in 1975 or 1976 when, according to Lurie, the pharmacy was in financial trouble. Shraiar, who was friendly with Rosenthal, proposed in 1976 that the pharmacy begin doing "insurance work" by accepting referrals from Rosenthal of accident patients needing surgical equipment.[13] Shraiar's control over the billing, according to Lurie, extended to oc-

casionally visiting the attorneys to whom bills were sent, either to bring new bills or to collect on ones for which the insurance companies had made payment. Many of these attorneys were the same as those associated with Hershenow and Rosenthal. Lurie testified that, although other employees and some pharmacy student interns may have done some of the billing on occasion, they would only have done so under Shraiar's direction.

For each of the counts against Shraiar the government produced a Beaconsfield Pharmacy bill. Of the eight counts on which guilty verdicts were returned, five of the bills were in Shraiar's handwriting. As to the other three, they contained initials that the jury could infer corresponded either to the names of employees working under Shraiar or to those of attorneys to whom the bills were sent. In addition, Shraiar's handwriting was on some of the checks deposited in the Beaconsfield account in payment of these bills. All of the accident patients who testified concerning his or her bill from the pharmacy pointed to discrepancies between what appeared there and what had actually been purchased. Three witnesses stated that they had never gone to the pharmacy. Much of the surgical equipment not actually purchased but appearing on bills was of a type which, according to Lurie, would require the customer's physical presence in order to be fitted. Although Lurie testified that he was personally unaware of the occurrence of any false billing, he repeatedly stated that, according to their partnership's division of labor, billing was under Shraiar's control. Several of the false bills admitted into evidence were for dates subsequent to Lurie's departure in early 1979.

■ Shraiar's control over all the billing, his handwriting on most of the bills and deposited checks, his relationship with the co-defendants and with the attorneys generating the referrals, and the substan-

---

13. The relationship between Shraiar and his co-defendants was also brought out through the testimony of the doctors' employees. One of Hershenow's secretaries testified that Shra-

iar would telephone the doctor on occasion. An employee of Rosenthal stated that Shraiar occasionally visited the office and that these visits did not involve medical treatment.

tial falsity of the bills are sufficient to warrant a jury to find Shraiar guilty beyond a reasonable doubt.[14]

The only other two issues are Hershenow's attack on his sentence and Shraiar's contention that he was not furnished with exculpatory evidence. Our review of the record convinces us that these are issues without substance.

*Affirmed.*

---

14. In connection with this claim and also as a separate issue, Shraiar argues that the government failed to produce a positive identification of him as the individual who serviced the patient-claimants at the pharmacy. He challenges as suggestive an out-of-court identification by a witness which served as the basis for that witness' in-court identification. The short answer to this claim is that the case against him did not involve the issue of identity; three of the overbilled customers testified that they had never gone to the pharmacy at all. The challenged identification had occurred outside the courtroom the day before the witness, Blotcher, testified. He recognized the defendant and asked the prosecutor if it was Shraiar, who confirmed that it was. The government concedes that this was improper and we agree. The defendant did not challenge the identification at trial, however, nor did he move to strike it. In light of the other evidence against him and the fact that identity was not at issue, we conclude that the error was harmless.