**UNITED STATES of America**

v.

**James McHUGH, et al.**

**Cr. A. No. 83–045 P.**

United States District Court,
D. Rhode Island.

Nov. 8, 1983.

James O'Neil, Asst. U.S. Atty., R.I., Providence, R.I., for plaintiff.

James Merberg, Boston, Mass., for Lawrence McHugh.

Martin G. Weinberg, Boston, Mass., for James McHugh.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

Defendants James McHugh and Lawrence McHugh (aka Les McHugh) have

both been charged in a two-count indictment with conspiracy to distribute marijuana, in violation of 21 U.S.C. § 846, and possession of marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(6). James McHugh has moved for this Court to suppress the search and seizure of a 1982 grey GMC pickup truck shortly before midnight on July 15, 1983, and all of the evidence which flows from that search. Although other searches and seizures occurred on the night of July 15–16 which are related to this case, only the search and seizure of the grey GMC truck (GMC) are at issue here because the government does not intend to use the other evidence. A hearing was held at which the Court received the testimony of Norman Phelps, Joseph Thomas, and Alfred Craven.

The testimony indicated that on the night of July 15, 1983, Norman Phelps, Joseph Thomas, and Officer Coffey were observing a residence known as the Malone Camp. Norman Phelps was employed with the state division of drug control as an inspector, a position which he had held for thirteen years. For the past two years he had been assigned to the Rhode Island Drug Task Force, a force comprised of federal, state, and local law enforcement officials whose task is to intradict drug smuggling activities. Joseph Thomas is a deputy United States marshall who was also assigned to the Rhode Island Drug Task Force. Officer Coffey was a member of the Little Compton, Rhode Island, Police Department. The Malone Camp is a water front residence along the Sakonnet River in Portsmouth, Rhode Island.

At 8:45 p.m. on July 15, the three officers were observing the Malone Camp from the opposite side of the Sakonnet River. Phelps had engaged in similar surveillance of the residence before. On the night in question, the three officers were using $7 \times 50$ binoculars, telescopes, and a nightscope to aid their vision.

Phelps decided to go to the Portsmouth side of the river to observe the Malone Camp from there. Phelps saw a tan Toyota which was driven by a woman leave the Camp. Phelps followed the Toyota into Little Compton, where it went to the residence of James McHugh.

Phelps returned to the entrance of the Malone Camp on Water Street at approximately 10:30 p.m. He was alone at that time but he was in radio contact with Thomas and Coffey, who remained on the opposite side of the Sakonnet. Between 10:30 and 11:00 p.m., Thomas radioed that he heard boats. He also radioed to Phelps that he saw lights coming to, and going from, the Camp on the river.

Shortly after 11:00 p.m., agent Phelps saw the grey GMC coming up the drive from the Camp to Water Street. A Jeep Wagoneer was parked at the mouth of the driveway, facing into the Camp. The GMC, which was proceeding with its lights out, came to a stop at the Jeep. The Jeep was backed out of the drive so that it was facing the intersection of the driveway and Water Street, with the Jeep in the correct lane for the way which it was facing (which was the lane on the Camp side of Water Street). Phelps observed this activity from the passenger side of a car on the opposite side of Water Street. Phelps' car, which was three or four car lengths from the Jeep, was on the same side of the driveway as the Jeep but faced the opposite direction. The Jeep came to a stop immediately next to the driveway and the driver left its lights on after he had stopped.

The bed of the GMC was covered with a camper-type "cap". The cap's windows were covered with cardboard. The GMC was pulled out of the driveway and into the same lane as the Jeep on Water Street. Phelps and the Jeep were on the opposite side of Water Street's intersection with the driveway from the GMC. Phelps testified that as the GMC pulled on to Water Street, it was moving slowly over rough road and rocked from side to side. At this time the camper cap, which had only recently been put on the truck,[1] was not securely affixed

---

1. The GMC had been observed earlier without a cap on it.

to the walls of the cargo bed. As the truck rocked out of the drive and on to the street, the cap separated from the walls of the cargo bed sufficiently to enable Phelps to see what was under the cap. Phelps saw large oblong bales covered with burlap, which he identified from his thirteen years of experience as a drug inspector to be bales of marijuana.

The Jeep's driver, who was James McHugh, jumped out of his vehicle and adjusted the cap as the GMC briefly paused.[2]

McHugh returned to the Jeep and started following Craven to Route 138. Phelps joined the caravan a short ways away, as did Officer Coffey, who was driving a separate vehicle. After one mile on Route 138, the Jeep turned around and headed back towards the Camp.

Coffey and Phelps discussed their observations over their radios as they drove. By this time the caravan was on Route 88 in Massachusetts. Phelps observed a Massachusetts state trooper at the side of the road giving another driver a ticket. Phelps stopped and enlisted the aid of the trooper, Officer Candeias. Candeias started chasing the GMC and stopped it. Phelps, who was right behind the trooper, got out of his vehicle. Candeias arrested Craven.

Phelps could smell marijuana inside the cap. He also could see inside the cap through the rear window of the cab of the truck which, unlike the side and rear windows of the cap, was not covered by cardboard. Phelps opened the rear of the truck and saw the distinctive looking burlap-covered bales, which confirmed his earlier identification of them as marijuana. He did not open the bales on Route 88. The GMC was towed to a nearby Massachusetts state police barracks where the cap was again opened and the bales observed. The bales were not actually opened until July 22.

The legal questions raised by the defense and prosecution are:

1) does James McHugh have standing to object to the stop of the truck?

2) was the stop without a warrant legal?

3) was the search of the truck at the scene without a warrant legal? and

4) was the opening of the bales a week later without a warrant legal?

## 1. STANDING

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."

A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

*Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 425 [58 L.Ed.2d 387] (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966 [22 L.Ed.2d 176] (1969)) (citations and footnote omitted).

Since the rule of "automatic standing" to object to the search and seizure of evidence in crimes of possession was overruled in *United States v. Salvucci*, 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980), the defendant asserting a fourth amendment violation must show that he "had a reasonable expectation of privacy in the place searched or the thing seized." *United States v. Thornley*, 707 F.2d 622, 624 (1st Cir.1983). Two factors must be proven to satisfy this test: first, did the defendant exhibit a subjective expectation of privacy and, second, was this

---

**2.** The driver of the GMC, Alfred Craven, testified that he did not stop on Water Street. However, in light of Phelps' testimony as to rough road, the Court believes that Craven may have paused briefly before going over a drop. James could well have secured the cap without Craven realizing it.

subjective expectation justifiable when viewed objectively under the circumstances. *Id.* (citing *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979)).

■ At the suppression hearing, Thomas testified that he had ordered a Registry of Motor Vehicles record search of the GMC three or four days before its seizure. The record check indicated that it was registered by a Paul Richter to Paul's Building Company. No connection was shown between either Paul Richter or Paul's Building Company and James McHugh. No evidence, other than some evidence that James was in actual possession of the vehicle, was introduced to show that James had any legal or legitimate interest in possession of the GMC.

The evidence of possession was not, of itself, very compelling. Phelps testified that the GMC had been observed at several locations associated with James McHugh. Thomas testified that he had seen both James and Lawrence McHugh, but no one else, drive the truck. He also stated that he had seen the truck for approximately three weeks before July 15. Alfred Craven testified about being asked by James to drive the truck earlier in the evening of the 15th from the Camp to James' house, in addition to the trip during which he was arrested. Finally, James McHugh has introduced no evidence of ownership of the marijuana in the GMC.

Although the Supreme Court has "emphatically rejected the notion that 'arcane' concepts of property law out to control the ability to claim the protections of the Fourth Amendment," *Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 2562, 65 S.Ct. 633 (1980), "property ownership is clearly a factor to be considered ...." *Salvucci, supra,* at 91, 100 S.Ct. at 2553. In this case not only does the Court have evidence that the truck did not belong to James, the Court has no evidence that James had any legal right to exclude others from its possession or use. *See Rawlings, supra,* at 105, 100 S.Ct. at 2561. Addition-

ally, at the time of the seizure, Craven was in possession of the vehicle.

In the light of these facts the Court finds James McHugh has not shown that he had an objectively justifiable expectation of privacy in the truck. Moreover, even if James were to argue that he has standing to object to the opening of the bales only, that argument would fail. *Thornley, supra,* at 624–25; *United States v. Hershenow,* 680 F.2d 847, 856–57 (1st Cir.1982).

Although the Court finds that James' lack of standing to object to the search and seizure of the GMC and the bales furnishes sufficient grounds for denying James' motion to suppress, the Court also agrees with the government that the search and seizure of the GMC and the bales was legal. To reach this separate and independent ground for the Court's holding, the remaining three issues must be discussed.

2. STOPPING THE GMC

■ The facts outlined above show that Phelps clearly had probable cause to ask Candeias to stop the GMC and arrest Craven. Phelps knew of the activities on the Sakonnet River and had seen that the GMC was full of bales which he, from his years of experience, recognized to be bales of marijuana. Additional suspicion could be inferred from the Jeep's escort of the GMC at the beginning of its last journey. Phelps could not have applied for a warrant beforehand because he did not have sufficient facts for probable cause until he saw the bales as Craven was leaving the Malone Camp.

3. SEARCH OF THE GMC

■ When the GMC was stopped, Phelps had probable cause to search it for bales of marijuana. This was then reinforced by Phelps' smelling the marijuana, which was in the rear of the truck, and his visual observations through the rear window of the cab, which was not covered by cardboard and which allowed him to see inside the camper cap.

■ Under the automobile exception to the warrant requirement, no search war-

rant is needed to search a vehicle which has been legally stopped. *Michigan v. Thomas,* 458 U.S. 259, 261–62, 102 S.Ct. 3079, 3081, 73 L.Ed.2d 750 (1982) (*per curiam* ); *United States v. Ross,* 456 U.S. 798, 823–24, 102 S.Ct. 2157, 2171–72, 72 L.Ed.2d 572 (1982). Moreover, the scope of the search is not limited to an examination of the vehicle's passenger compartment; "[r]ather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *Ross, supra,* at 824, 102 S.Ct. at 2172. Additionally, although counsel argues that a warrant should have been obtained to search the truck once the police had seized it,

> [i]t is ... clear that the justification to conduct ... a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.

*Thomas, supra,* at 261, 102 S.Ct. at 3081.

Agent Phelps had probable cause to search the truck for bales of marijuana. The scope of the search was reasonable and no warrant was required. The searches of the truck along the road and at the barracks were both legal.

### 4. OPENING THE BALES

Defendant's final contention is that the police were required to obtain a warrant to open the bales on July 22. McHugh admits that the police could have opened the bales soon after seizing the GMC, *Ross, supra,* at 807 n. 9, 102 S.Ct. at 2163 n. 9, but he argues that this does not justify their initial opening seven days later. *See United States v. Johns,* 707 F.2d 1093, 1099 (9th Cir.1983). In effect, he argues that the seven day delay destroys the automobile exception to the warrant requirement.

This Court agrees that if an opaque container which did not disclose its contents was seized from an automobile and then not searched until seven days later, a war-

rant would be required. However, the Court does not agree that the bales of marijuana seized in this case required a warrant to be opened under the Fourth Amendment.

In *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), the Supreme Court stated in footnote 13 that

> [n]ot all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant. See *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968) (*per curiam* ). There will be difficulties in determining which parcels taken from an automobile require a warrant for their search and which do not. Our decision in this means only that a warrant generally is required before personal luggage can be searched and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile.

*Id.* at 764–65 n. 13, 99 S.Ct. at 2593–94 n. 13.

Footnote 13 of *Sanders* has engendered a great deal of discussion in subsequent opinions. In *Robbins v. California,* 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), the police opened a station wagon's recessed luggage compartment and found two packages wrapped in green opaque plastic, each of which was a bit larger than a cigar box. *Id.* at 422 & n. 1, 101 S.Ct. at 2844 & n. 1 (plurality opinion by Stewart, J.). Each of these was unwrapped and found to contain fifteen pounds of marijuana. *Id.* at 422, 101 S.Ct. at 2844.

Justice Stewart, whose opinion was joined by Justices Brennan, White, and

Marshall, sought to explain footnote 13 of *Sanders:*

> The second of these exceptions [ (that the contents are open to plain view) ] obviously refers to items in a container that is not closed. The first exception is likewise little more than another variation of the "plain view" exception, since, if the distinctive configuration of a container proclaims its contents, the contents cannot fairly be said to have been removed from a searching officer's view. The same would be true, of course, if the container were transparent, or otherwise clearly revealed its contents. In short, the negative implication of footnote 13 of the *Sanders* opinion is that, unless the container is such that its contents may be said to be in plain view, those contents are fully protected by the Fourth Amendment.
>
> *Id.* at 427, 101 S.Ct. at 2846.

Commenting on testimony at the suppression hearing, Justice Stewart concluded:

> [The] testimony certainly did not establish that marihuana is ordinarily "packaged this way." Expectations of privacy are established by general social norms, and to fall within the second exception of the footnote in question a container must so clearly announce its contents, whether by its distinctive configuration, it transparency, or otherwise, that its contents are obvious to an observer. If indeed a green plastic wrapping reliably indicates that a package could only contain marihuana, that fact was not shown by the evidence of record in this case.
>
> *Id.* at 428, 101 S.Ct. at 2847 (footnote omitted).

Justice Rehnquist, in dissent, thought that the search of the packages was reasonable under footnote 13 of *Sanders. Id.* 437, 441–42, 101 S.Ct. 2851, 2854 (Rehnquist, J., dissenting). His analysis, however, seems to interpret footnote 13 not as a species of the plain view doctrine, but rather as a totality of the circumstances test. *See id.* at 442, 101 S.Ct. at 2854 (implying that police could also use statements of a suspect in deciding whether the contents of containers " 'could be inferred from their outward appearance.' ").

In his dissent, Justice Stevens did not address the question of whether footnote 13 of *Sanders* applied to the packages found in *Robbins. Id.* 444, 101 S.Ct. 2855 (Stevens, J., dissenting). Justice Stevens, however, did note that he doubted that the owner of the packages had any expectations of privacy in them:

> If containers can be classified on the basis of the owner's expectations of privacy, it would seem rather clear to me that a brick of marihuana wrapped in green plastic would fall in the nonprivate category. I doubt if many dealers in the substance would be very comfortable carrying around such packages in plain view.
>
> *Id.* at 447 n. 5, 101 S.Ct. at 2856 n. 5 (citation omitted).

Justice Stevens further discussed the meaning of footnote 13 of *Sanders* in his opinion in *Texas v. Brown,* —— U.S. ——, ——, 103 S.Ct. 1535, 1545, 75 L.Ed.2d 502 (1983) (Stevens, J., joined by Brennan and Marshall, JJ., concurring in the judgment). Justice Stevens' opinion focussed, in part, on an issue unaddressed by the plurality opinion—how an officer could open a closed, uninflated party balloon, which the officer believed to contain heroin, without a warrant:

> [T]he balloon could be one of those rare single-purpose containers which "by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance." *Sanders, supra,* 442 U.S. at 764–765, n. 13, 99 S.Ct., at 2593–2594, n. 13. Whereas a suitcase or a paper bag may contain an almost infinite variety of items, a balloon of this kind might be used only to transport drugs. Viewing it where he did could have given the officer a degree of certainty that is equivalent to the plain view of the heroin itself. It that be true, I would conclude that the plain view doctrine supports the search as well as the seizure even though

the contents of the balloon were not actually visible to the officer.

*Id.* at ——, 103 S.Ct. at 1547 (footnote omitted).

▮ Applying these opinions to the facts of this case, this Court holds that the burlap-covered bales of marijuana in this case did not require a warrant to be searched after seven days because they did not give rise to an expectation of privacy cognizable under the Fourth Amendment. Agent Phelps, who had had thirteen years of experience in drug enforcement, testified that from the appearance and smell of the burlap-covered bales, he believed they contained marijuana. Whoever put the bales in the truck seemed to be anxious to conceal them—the cargo bed of the pickup was covered with a camper cap, and the cap's windows were covered with cardboard. That person, by covering the cap's windows to hide the bales, seems to have had more of a reasonable expectation of privacy in the truck than in the contents of the bales. Between the distinctive appearance of the bales and their odor, the contents of the bales could "be inferred from their outward appearance." *Sanders, supra,* 442 U.S. at 764 n. 13, 99 S.Ct. at 2593 n. 13. It therefore did not violate the Fourth Amendment to open them later.

The Court recognizes that other courts have stated that similar packages did not proclaim their contents. For example, in *Sharpe v. United States,* 660 F.2d 967 (4th Cir.1981), *vacated* 457 U.S. 1127, 102 S.Ct. 2951, 73 L.Ed.2d 1345 (1982) (vacated for reconsideration in the light of *Ross, supra* ), a majority of a Fourth Circuit panel found that the "well-packaged bales" in that case, each of which "consisted of a tube of marijuana wrapped first in paper bags, then in a taped plastic bag, and finally in burlap tied with twine", *id.* at 972 n. 3, did not manifest their contents. *Id.* at 972. The opinion in that case, which involved the stop of a pickup truck in South Carolina, stated that the defendants had "produced ample evidence of the virtual identity in appearance of the marijuana bales and bales of tobacco, cotton goods, and hemp."

*Id.* at 972 n. 4. The majority also may have doubted an officer's testimony that he smelled marijuana in the truck. *See id.* at 972–73 n. 5.

One member of the three-judge panel dissented. *Id.* at 973 (Russell, J., dissenting). In part, Judge Russell stated that the defendants in *Sharpe*

cannot reasonably claim to have a Fourth Amendment privacy interest in the bales of marijuana. If, as the majority notes, the bales could just as easily have contained "tobacco, cotton goods, and hemp" then it is clear that the forty-three bales—by both their nature and their number—betrayed that they did not contain personal items, but must have contained some agricultural commodity. I do not believe that even if Agent Cooke had not smelled marijuana that the bales would have been protected under a privacy theory. If, as the majority assures us these bales could have contained one of several agricultural products, I do not think that, before the public could search them, they would have to eliminate every possible commodity except marijuana— no more than they would have to know whether a gun case contained a Remington, a Winchester, or a sawed-off, homemade shotgun. Nor is it of any account to argue that the bales *might* have contained personal items, since someone might just as easily pack socks, underwear, and a toothbrush in a gun case or in a burglar's kit.

Thus the marijuana in this case was, I submit, in "plain view" or "otherwise clearly revealed." One controlling fact here is that the odor of the marijuana— over 2,600 pounds—was distinctive and clearly observable. That was sufficient to place the contents of the bales in "plain view."

*Id.* at 980 (emphasis in original).

This Court believes that however likely it is that a pickup in South Carolina might carry similarly shaped bales of tobacco, cotton, or hemp, and that the owner could have any expectation of privacy in them, it would stretch credibility to the limit to hold

that James McHugh could have had a reasonable expectation of privacy in these bales. For this reason, and for the independently sufficient reason that James McHugh has no standing to suppress the evidence, it is hereby ordered that his motion to suppress be DENIED.