**UNITED STATES of America, Plaintiff**

**v.**

**Jorge I. GARCIA–ROBLEDO, Defendant.**

**Criminal No. 06–248(ADC).**

United States District Court, D. Puerto Rico.

April 26, 2007.

G. Andrew Massucco–Lataif, United States Attorney's Office, San Juan, PR, for Plaintiff.

Jason Gonzalez–Delgado, Gonzalez & Gonzalez Law Office, Caguas, PR, for Defendant.

## OPINION AND ORDER

DELGADO–COLON, District Judge.

On December 19, 2006 [1] and January 9, 2007, evidentiary hearings were held on defendant's Motion to Suppress Evidence Seized (**Docket No. 17**). A Report and Recommendation was issue by Magistrate–Judge Camille Vélez–Rivé on March 15, 2007. In determining that the evidence seized by the government was obtained as a result of a validly conducted inventory search, the Magistrate–Judge recommends denial of defendant's motion to suppress. It is also concluded by the Magistrate–Judge that defendant's detention and subsequent arrest was not in violation of defendant's Fourth Amendment Rights. (**Docket No. 41**). No objections to the Report and Recommendation have been filed by defendant or the government.

Having carefully reviewed defendant's motion (**Docket No. 17**), the government's opposition (**Docket No. 19**), the Report and Recommendation (**Docket No. 41**), transcripts or testimonies presented at the evidentiary hearing (**Dockets 37–38**) and documentary evidence presented (Exhibits A; 1–3), this Court concurs with the recommendation within the Magistrate–Judge's Report and Recommendation and consequently adopts the same.

This Court concludes that:

(a) Defendant was initially stopped due to a traffic violation. On site verification of the vehicle's license plate, registration and VIN number reflected that the license plate was reported "lost" and that the vehicle was registered to Eurobank. Meanwhile, the vehicle's registration was registered to a different institution: "First Leasing". More so, the vehicle had a duty stamp reflecting "SJ–18", a stamp that police officers knew had been discontinued by the Puerto Rico Transportation and Public Works Department. The lower segment of the vehicle registration, which is to reflect "year, month and date", began with the number "4004". Depiction of year beyond "2007" indicated to police officers that the license was false and from the existence of reasonable suspicion to stop and investigate the setting changed to one of probable cause for defendant's arrest as soon as the Puerto Rico Police Department, Command Center, verified the vehicle's VIN number. The search reflected the vehicle was reported stolen. At this point, Puerto Rico Police Officers had probable cause to arrest defendant García–Robledo. At the time, no illegal items or evidence of contraband were seen in plain view. Defendant García–Robledo failed to present any evidence

---

1. On this date, testimony was heard to determine whether defendant had "legal standing" to challenge the government's actions. Although at the time of arrest, defendant was found in the possession of a vehicle previously reported "stolen", having a registration that was altered or counterfeited, or otherwise false; in the case at bar, for all legal and practical purposes it was considered defendant had "standing",

to challenge the validity of the traffic stop. **(Docket No. 41,** pp. 30). The fact that the traffic violation did occur, that the license plates were reported "lost" and the vehicle's registration revealing the year "4004" was false. (*Id,* pp. 34).

(b) Once defendant had been taken to the police headquarters, an inventory search was conducted pursuant to statutory provisions demanding detailed inventories of vehicles reported abandoned or stolen.[2] (*Id.* pp. 35, 37). The search revealed that behind the rear seat, along with a wrench and metal rod, there was a red bag containing a yellow bag. Within the later, two (2) brick size packages were found. Subsequent K–9 inspection of the area positively confirmed the agent's suspicious of having a controlled substance within these two (2) packages. The inventory search was conducted in defendant's presence.

(c) Defendant García–Robledo was twice properly advised of his constitutional rights. First, defendant was read his rights upon his arrest at the time in which the police learned the vehicle was reported stolen. The second time, immediately upon the brick size packages were found during the inventory searched.

(d) Defendant has failed to rebutt said evidence.

Accordingly, Defendants Motion to Suppress is **Denied.**

**SO ORDERED.**

**2.** See Puerto Rico Police Department General Order No. 83–12. (Docket No. 19, pp. 10, Attachment "J").

**1.** The First Circuit has ruled that it is a better practice—at least where, as in this case, the answer to the inquiry is plain—to refrain

## REPORT AND RECOMMENDATION

VELEZ–RIVE, United States Magistrate Judge.

## INTRODUCTION

Defendant Jorge García–Robledo ("García–Robledo") filed a Motion to Suppress which was referred by the Court to the undersigned Magistrate Judge for report and recommendation (Docket No. 20). García–Robledo claims some Puerto Rico Police Officers ("PRPOs") illegally detained him and conducted an illegal inventory search of the vehicle he was driving on August 6, 2006 (Ford F–250 King Ranch pickup truck) in violation of the Fourth Amendment of the United States Constitution. Accordingly, García–Robledo seeks to suppress the two (2) kilograms of cocaine which were recovered from said vehicle. (Docket No. 17).

The government filed its Opposition to above motion arguing García–Robledo lacks standing to challenge vehicle's search; the PRPOs had probable cause to initially stop defendant's vehicle due to a traffic violation; and the inventory search was proper. (Docket No. 19).

On December 19, 2006, at the evidentiary hearing held, the testimonies of García–Robledo and Mrs. Dorisbel Marcano–Ríos ("Mrs. Marcano"), defendant's wife, were heard as to the issue of standing.[1] (Docket No. 32).

On December 21, 2006, an Order was issued by the Court finding defendant García–Robledo had established, at that stage of the proceedings, standing to challenge

from reaching the merits of a challenged search and seizure unless the movant has succeeded in crossing the standing threshold. *United States v. Aguirre,* 839 F.2d 854, 859 (1st Cir.1988).

the seizure of the narcotics under the totality of the circumstances and the evidence before the Court. The Court noted that its ruling was going to be discussed in detail in this report and recommendation on the merits of the suppression issue. The suppression hearing was re-scheduled for January 9, 2007. (Docket No. 31).

On January 9, 2007, the testimonies of PRPO Joel Machuca–Allende ("PRPO Machuca"), on behalf of the government, and of Mrs. Marcano, on behalf of the defense, were heard on the merits. The Court granted the parties twenty (20) days to submit the translations of the exhibits. (Docket No. 33).

On February 12, 2007, the transcripts of the suppression hearing were ordered to be transcribed. (Docket No. 35).

On March 2, 2007, an Order was issued by the Court informing the parties they had failed to comply with the deadline to file the translations of the exhibits and granting the parties until March 9, 2007 to submit said translations. (Docket No. 36).

On March 5, 2007, the transcripts of the suppression hearing were filed with the Court. (Docket No. 37 and 38). On March 8, 2007, the certified translations of the exhibits were filed (Docket No. 39).[2]

## FACTUAL BACKGROUND

### STANDING:

**Testimony of defendant García–Robledo, as to standing, may be summarized as follows:**

García–Robledo, after being properly advised by his counsel and the under-signed of the possible consequences of testifying at the suppression hearing, stated he is a marine technician and was working in installing tiles. On August 6, 2006, García–Robledo was driving a Ford F–250 King Ranch that he bought in Caguas on the Tuesday of that week. García–Robledo testified he bought the Ford F–250 at Road # 1 in Caguas after he saw the vehicle parked with a "for sale" sign. García–Robledo spoke to the vehicle's owner at the business where the vehicle was parked. García–Robledo discussed the price of the vehicle with the owner and paid $5,000.00 in addition to tendering an old 1986 or 1987 Toyota Corolla, which was not registered under his name because the change in owner had not been done. The person from whom García–Robledo bought the Ford F–250 was identified as Josué LNU. Josué told García–Robledo the vehicle was not paid off and that it had a loan. Josué asked García–Robledo for all his personal information and García–Robledo explained to Josué he could not transfer title of the vehicle under his name because his credit was not sufficient. Josué informed García–Robledo that in two (2) weeks he was going to give García–Robledo the payment booklet from the bank with the payment coupons, the promissory note and the exact amount to pay. Prior to buying the Ford F–250 vehicle, García–Robledo checked the vehicle's registration, the sticker ("marbete") and license plate; everything looked fine to him.

García–Robledo identified Exhibit A as a photocopy of the Ford F–250's registration which was handed to him by Josué when

2. Thus, the motion to suppress was deemed submitted on March 8, 2007. The law incontrovertibly demands federal litigation in Puerto Rico shall be conducted in English. 48 U.S.C.A. § 864. In collecting record the United States District Court for the District of Puerto Rico must sift out non-English materials, and parties should submit only English language materials. 48 U.S.C.A. § 864. *See González–De–Blasini v. Family Dept.,* 377 F.3d 81 (1st Cir.2004); *Estades–Negroni v. Associates Corp. of North America,* 359 F.3d 1 (1st Cir.2004).

he purchased the vehicle. The original registration was going to be provided by Josué with the other papers in two (2) weeks.

On cross-examination, García–Robledo admitted the day of his arrest was a Sunday and he had purchased the Ford F–250 six (6) days before. García–Robledo bought the vehicle at a bar in Road # 1 (located in front of the dealer Anansys Auto Part Dealer) in which the Ford F–250 was parked in the front of the business in the avenue and had a "for sale" sign in the window. When García–Robledo entered the business he asked about the vehicle which was for sale and a person (later identified as Josué) told him he was asking $8,000.00 for the car in addition to the loan. The day García–Robledo bought the Ford F–250, he was driving a 1986 or 1987 gray two (2) doors automatic Toyota Corolla he bought one (1) month before at a fair in San Lorenzo for $2,000.00. García–Robledo wanted to sell the Toyota Corolla because he needed a pick up for his work. García–Robledo had the Toyota Corolla for one (1) month and never registered it under his name because the sticker ("marbete") was still valid. García–Robledo did not recall the name of the person from whom he bought the Toyota Corolla but he had that person's telephone in the cellular telephone which was seized the day of his arrest.

García–Robledo identified Exhibit 1 as a photocopy of the advise of rights in the Spanish language he was provided on the day of his arrest. García–Robledo indicated he was never allowed to read the document. The paper was put in front of him and he was asked to sign it. García–Robledo said to the agents he was not going to say anything until he was given an opportunity to call an attorney. García–Robledo identified his initials on the document and he admitted he reads Spanish but did not read the whole document. García–Robledo stated he does not know why he initialed the document six (6) times. The second page of Exhibit 1 is a hand written statement by García–Robledo in which his signature also appears which reads as follows: "I purchased this SUV five (5) days ago. I paid for it $5,000 plus a 1987 Toyota car and I'm supposed to receive the coupon booklet to make the payments." García–Robledo wrote the statement because one of the officers asked him to write down how he acquired the Ford F–250. García–Robledo explained that the account for the Ford F–250 was for $8,000.00 and three (3) years were owed by the owner. The note was $790.00. Therefore, the vehicle roughly owed $27,000.00. García–Robledo paid $5,000.00 plus the Toyota Corolla, which was worth about $2,000.00, for a total of $7,000.00. Thus, García–Robledo purchased the Ford F–250 for approximately $34,000.00. García–Robledo did not do anything to verify whether the vehicle was stolen, besides verifying the sticker ("marbete") to correspond to the vehicle's registration. García–Robledo was to make payments to the bank upon receipt in two (2) weeks of the payment booklet. García–Robledo never contacted the bank because the bank was not going to approve him for the loan because he had another loan for a 2004 Nissan Titan pick-up for which he paid $751.00 monthly. García–Robledo gave a $5,000.00 down payment for the Nissan pick-up which was worth approximately $45,000.00. García–Robledo was able to buy the Ford F–250 because he was going to continue making the payment to the bank under the seller's name.

García–Robledo testified that, pursuant to Exhibit A, the owner of the Ford F–250 is First Leasing and Rental Corp. ("First Leasing"). Josué was the person who had the payment booklet and the other documents of the vehicle. García–Robledo un-

derstands that First Leasing owns the title of the car pursuant to Exhibit A. Thus, Josué may have had a lease for the vehicle with First Leasing. García–Robledo stated he did not know what a lease was but he was willing to take the car because he had heard that, after a period of time, he could keep the vehicle or trade it in. García–Robledo did not know whether the car had a residual. Josué told him he had paid $10,000.00 as down payment. Taking a look at Exhibit A, García–Robledo testified that, pursuant to the sticker ("marbete") it expires on April 2007 but pursuant to the registration, the sticker is valid from March 2005 and expires on April 2006. Even though the registration says that it expires in 2006 and the "marbete" says its expires in 2007, García–Robledo did not notice this discrepancy when he purchased the Ford F–250.

At the time of purchase, García–Robledo did not take down the seller's address nor full name. García–Robledo had the Ford F–250 for about six (6) days and he drove around Fajardo, in the area where he resides and he took the vehicle to work. On August 6, 2006, García–Robledo left Fajardo, went to Naguabo to pick up his wife at her mother's house and they went to Carolina to eat. This is the first time García–Robledo drove the Ford F–250 to his wife's place.

García–Robledo stated he had another car, a Nissan 2004 Titan pick up truck, reason for which the bank was not going to approve his credit. He paid $751 monthly for the Nissan, he gave $5,000.00 down payment and Reliable has the account. The total value of the Nissan when he bought was $45,000.00.

García–Robledo's wife found out he had bought the Ford F–250 when she saw it on August 6, 2006. No one else knew he had bought the Ford F–250 except Toño LNU who worked installing ceramic tiles. Oth-

er people may have seen García–Robledo going in and out at Villa Marina in Fajardo in the Ford F–250.

Upon questions of the undersigned, García–Robledo testified he does not recall the mileage of the Ford F–250 when he bought it. García–Robledo test drove the Ford F–250 along Road # 1 before he bought it. No one else drove the Ford F–250 after García–Robledo acquired it and he had control of its keys. Josué kept a set of keys he was going to hand to García–Robledo along with the other pending documents in two (2) weeks. García–Robledo testified he was not authorized by First Leasing to drive the vehicle.

**Testimony of Mrs. Marcano, as to standing, may be summarized as follows:**

Mrs. Marcano testified she recalled the day when the PRPOs stopped her and García–Robledo at around 11:00 am to 11:30 am while they were in a brown big pick up truck. They left Naguabo and were driving on 65th Infantry Road. During the months of August and September of 2006, Mrs. Marcano resided at an apartment downstairs while her sister lived with her husband upstairs in Barrio Duque in Naguabo. The day of the incident, Mrs. Marcano came out of her sister's house and she was picked up by García–Robledo around 10:00 am to 10:30 am. Thus, about one hour passed between the time García–Robledo picked her up and the time they were stopped by the PRPOs. This was the first time Mrs. Marcano was picked up by García–Robledo at her sister's house because she was separated from García–Robledo for about two and a half months. Once they got married, they rented a house from 1997 until 2004. Then, they moved downstairs at her sister's house where she lived with García–Robledo for about two (2) years. On August 6, 2006, García–Robledo was not residing with Mrs. Marcano.

Before they were separated, García–Robledo used to drive a red Toyota vehicle and he also had a champagne colored pick up ("guagua"). The first time that Mrs. Marcano saw García–Robledo driving the Ford F–250 was the day of the incident and she did not know the status of the vehicle. On the day of the incident, no one saw her enter the Ford F–250. She does not know who sold the Ford F–250 to García–Robledo or who was the rightful owner.

**MERITS:**

**Testimony of PRPO Joel Machuca–Allende:**

The government presented the testimony of PRPO Joel Machuca–Allende ("PRPO Machuca") which may be summarized as follows:

PRPO Machuca has been assigned to the Puerto Rico Police Department's San Juan Stolen Vehicles Division as an investigating agent for the past nine (9) years. As an investigating agent, he is assigned stolen vehicle complaints and he does preventive patrolling on the streets.

On August 6, 2006, PRPO Machuca started his duty at 10:00 am and was on patrol. On that day, PRPO Machuca issued a traffic ticket which he identified as Exhibit 2. Exhibit 2 is a photocopy of administrative violations ticket number 20141839 issued on August 6, 2006 to Jorge García–Robledo bearing PRPO Machuca's name and badge number at the bottom. Prior to issuing the ticket, PRPO Machuca did not know García–Robledo.

The facts which led PRPO Machuca to issue the ticket to García–Robledo are the following: PRPO Machuca was driving on 65th Infantry Avenue on the way to Río Piedras, along with fellow PRPO Carlos Serrano–Madera ("PRPO Serrano"), in a marked PRPD patrol vehicle. When they got to the Juan Peña Reyes Street, he noticed a brown King Ranch model Ford F250 pick-up truck which drove through the traffic red light at the Juan Peña Reyes Street. PRPO Machuca turned on the flashing lights and the siren of the patrol car, went through the traffic light, with all due precautions, until he caught up with the vehicle and ordered the vehicle to stop. PRPO Machuca radioed the license plate to the Command Center for it to be ran on the computer system. The Command Center's duty officer replied the license plate was showing as a lost plate from Eurobank. Then, PRPO Machuca got out of the patrol car, approached the driver's area and requested the driver's license and the vehicle's registration. When PRPO Machuca saw the vehicle's registration, he noticed the vehicle was registered in the name of First Leasing and the stamp for duties paid said "SJ 18." The "SJ 18" stamp is a stamp which has been discontinued by the Transportation and Public Works Department. Thus, PRPO Machuca proceeded to find the vehicle's registration number ("VIN number"), provided it to the Command Center where it was ran and it showed that there was a lien on the vehicle for theft. At that time, PRPO Machuca contacted the Río Piedras Precinct so they could send a female to the location because there was a young lady inside the vehicle.

PRPO Machuca was shown Exhibit A and he indicated it was a photocopy of the vehicle's registration he had seen on August 6, 2006 when García–Robledo showed it to him. PRPO Machuca reviewed the vehicle's registration and the first thing which caught his attention was that the vehicle was under the name of First Leasing and the license plate was registered to Eurobank. In addition, PRPO Machuca noticed the duties stamp at the bottom said "SJ 18." The "SJ 18" was discontinued by the Transportation and Public Works Department because it was lost.

Thus, the "SJ 18" stamp is no longer in use. PRPO Machuca also observed that, at the bottom of the vehicle's registration, it showed a number starting with "4004" and we have not gotten to that year. If the license were to be valid, it would first give the year, then the month and then the day it was issued by the Transportation and Public Works Department. Thus, PRPO Machuca concluded the vehicle's registration was altered, false, falsified or forged when García–Robledo handed it to him. After PRPO Machuca saw the vehicle's registration, the VIN number was ran at the Command Center and it came back with a stolen vehicle lien or hold. Thus, the vehicle was stolen. García–Robledo gave his driver's license to PRPO Machuca. After PRPO Machuca found out the vehicle was stolen, he requested a confirmation from the Río Piedras precinct for them to send over a female officer because there was a female inside the vehicle. PRPO Machuca read to García–Robledo his rights and then proceeded to search him for García–Robledo's safety and his own safety. A surface check was done of the vehicle to make sure there was no property belonging to the occupants. Nothing was seized at that time.

Then, the persons and the Ford F–250 vehicle were taken to the San Juan Stolen Vehicles Division located on # 900 Serra Street at Stop 15 in Santurce. Upon arrival, PRPOs Machuca and Serrano proceeded to conduct an inventory search of the Ford F–250 vehicle in the presence of García–Robledo. An inventory search of the vehicle was done because when there is a stolen vehicle hold, or an abandoned or disappeared vehicle, there is a regulation which requires an inventory in order to safeguard the people's property. At that time, PRPO Machuca did not suspect the driver of having committed any other violation other than what he was arrested for.

PRPO Machuca identified a photocopy of the PPR 128 form which is the inventory of the vehicle which was written in his handwriting and on the second page it has his signature and badge number. The PPR 128 was admitted as Exhibit 3.

While the inventory search was being conducted in the presence of García–Robledo, the PRPOs found a red bag on the back seat on the left side bearing the letters "Carolina Municipality." Inside the red bag, there was a yellow bag, and inside the yellow bag there were like two (2) bricks or two (2) packages shaped like bricks. At that point in time, PRPO Machuca did not know what those packages were. A canine unit was called in as part of the standard procedure of the PRPD when something is found inside a vehicle with which the agents are not familiar.

An hour later, an officer arrived with a canine unit and he walked the canine unit around the vehicle. After the canine unit verified the vehicle's surrounding area, the vehicle was opened up and the canine unit checked inside the vehicle. The canine unit stood on the back part of the vehicle on the left hand side because he was marking that there could be possible controlled substances. The red bag was found in the left side of the back seat, that is the back panel of the second row of seats of the pick-up inside the cab area. Behind the back seat of these vehicles there is a small space containing a wrench to change the bolts on the tires and there is a metal rod used to lift the car to change a tire. After the canine unit verified the vehicle, PRPO Machuca took García–Robledo to the interview area where he again was read his rights, which he signed and initialed.

PRPO Machuca identified Exhibit 1 as a photocopy of the two (2) page document of the rights which were read to García–Robledo on August 6, 2006 which bears PRPO Machuca's signature and badge

number. García–Robledo signed this document in the interview room. After García–Robledo was read his rights for a second time, he stated he had purchased the Ford F–250 vehicle five (5) days before in Caguas.

On cross-examination, PRPO Machuca stated that on August 6, 2006, before the incident in this case, he intervened with two other people for a Law 8 violation (stolen vehicles, stolen vehicle parts and illegal registrations) and these two persons were not arrested.

On August 6, 2006, PRPO Machuca was traveling on 65th Infantry Road from Carolina to San Juan and at 1:00 p.m. he saw the Ford F–250 vehicle coming into the 65th Infantry Road. The patrol vehicle was two cars behind García–Robledo's vehicle. After being behind the vehicle for five (5) or six (6) minutes, PRPO Machuca saw the vehicle running through the red light at Juan Peña Reyes Street. Then, PRPO Machuca turned on the flashing lights and siren for other people to allow him to go through the red light with all due precautions. The Ford F–250 vehicle was stopped at the next traffic light in Road 181, which is the Trujillo Alto Expressway. When García–Robledo was ordered to stop via the PA radio, he stopped at the traffic light and then, when the traffic light changed, he proceeded to go past the traffic light. When García–Robledo was told to stop after passing the traffic light, PRPO Machuca proceeded to run the license plate through the Command Center. About one minute later, PRPO Machuca received information that the license plate belonged to Eurobank and was lost. PRPO Machuca stated that with a lost license plate the vehicle could not be driven. Based on PRPO Machuca's experience, he thought the vehicle could be stolen. PRPO Machuca stated that García–Robledo could have left the scene after

having been issued the ticket. But, he could not have left once he showed PRPO Machuca the vehicle's registration in the name of First Leasing. PRPO Machuca asked for the driver's license and vehicle's registration and he checked both documents. García–Robledo provided a valid driver's license. PRPO Machuca verified that the license plate matched the one in the registration. What sparked PRPO Machuca's attention was that, based on the information received from the Command Center, the license plate was registered to Eurobank and the vehicle's registration showed First Leasing as the owner of the vehicle. García–Robledo and his wife were not under arrest during the five (5) minutes which transpired between the time the vehicle was stopped and the time information was received that the VIN number showed the vehicle was stolen. After the vehicle showed as stolen, García–Robledo and his wife were put under arrest. A visual search of the vehicle was done at the scene and nothing was found at plain view. PRPO Machuca then decided to bring the vehicle to the San Juan Stolen Vehicles Division. PRPO Machuca drove the Ford F–250 to the police station and PRPO Serrano transported García–Robledo in the patrol car. On the way to the San Juan Stolen Vehicles Division, PRPO Machuca called the desk sergeant on duty to let him know they were going to arrive with a stolen vehicle. Both PRPOs Machuca and Serrano arrived at the same time to the San Juan Stolen Vehicles Division. García–Robledo was under arrest and hand-cuffed.

Upon arrival, PRPO Machuca got out of the Ford F–250, went to his patrol car, got his documents and immediately started to perform the inventory search in García–Robledo's presence. The inventory search took about ten (10), fifteen (15), twenty (20) minutes. Everything is marked in the inventory search PPR–128 form. The part

entitled "cotejo de llegada a la unidad policiaca" has to be certified and filled out by the person in charge of the vehicle within the division but that person was not present there at the time. Thus, that part was not filled out. The part that says "cotejo de salida o entrega" was filled out a few days later. Exhibit 3 is thus incomplete because that part is in blank but the original is complete.

The red bag which was found during the inventory search was closed and PRPO Machuca opened it to see its content. Inside the red bag there was a yellow bag that was tied up and holding something inside. The yellow bag was opened and they found something the agents did not know what it was. The canine unit was called in and the bag was not removed from behind the back seat on the left hand side of the vehicle. The zipper on the red bag was closed back but the yellow bag was not closed. PRPOs Machuca and Serrano, along with García–Robledo, stood outside the vehicle for one (1) hour waiting for the canine unit to arrive. García–Robledo's wife was inside a cell on the second floor. When the canine unit arrived, PRPO Machuca explained to the canine officer that there was something inside the vehicle and they did not know what it was. The vehicle was closed when the canine unit arrived. The canine unit was brought and it went around the vehicle. PRPO Machuca did not see the canine unit do anything when he was walked around the vehicle. When the canine unit went around the vehicle, the trainer returned to near where the patrol car was and he stayed there standing with the canine unit and told the PRPOs to open the vehicle. When the vehicle was opened, the trainer took the canine unit with a leash and the canine unit entered inside the front part of the vehicle. The canine unit sniffed around and came out of the front part of the vehicle. Then, the canine unit went to the back part of the vehicle and stood still on the left hand side and made some kind of signal for his trainer. The trainer then said the canine unit had detected something.

Exhibit 2, the traffic ticket, was prepared later on at the San Juan Stolen Vehicles Division when they arrived. PRPO Machuca did not have García–Robledo sign the traffic ticket at the space entitled "violator's signature" because he refused to sign it. Nonetheless, García–Robledo did not refuse to sign the Miranda warnings nor the PPR–128 form. PRPO Machuca did not write in the space entitled "observations" the reasons why García–Robledo did not sign the traffic ticket. The original traffic ticket was provided to García–Robledo along with a copy of the PPR–128. The ticket was issued from PRPO Machuca's ticket booklet which is assigned to him and which he carries when he goes out to investigate. PRPO Machuca had the ticket booklet with him on August 6, 2006. PRPO Machuca did not write in any report the fact that García–Robledo refused to sign the traffic ticket. PRPO Serrano did not intervene with García–Robledo, he only transported him to the division.

On re-direct examination, PRPO Machuca stated he had no training as a canine unit trainer and that it was the first time he had seen the canine unit which was brought that day. PRPO Machuca indicated there is a fine associated to a traffic ticket and the amount of the fine is written down on the ticket. There are no fines associated with the Miranda warnings nor the PPR–128.

On re-cross examination, PRPO Machuca stated that the fine for running a red light is $60.00.

**Testimony of Mrs. Marcano:**

The defense presented the testimony of Mrs. Marcano which may be summarized as follows:

Mrs. Marcano knows García–Robledo because he is her husband. On August 6, 2006, she was traveling on a pleasure ride with García–Robledo on 65th Infantry Road without a specific direction. They stopped at the traffic light close to Bella International and were waiting for the light to change when they heard someone who said to move to the side. García–Robledo stopped on the right hand side immediately after crossing the traffic light. Mrs. Marcano stated that a police officer, who was not PRPO Machuca and whom she had not seen that day in court and whom she did not recall the name, ordered them to stop and asked García–Robledo for his driver's license, to turn off the vehicle and to open the door. García–Robledo did what he was asked to do. When the PRPO was looking at the driver's license, he told García–Robledo to get out of the vehicle, he handcuffed him and asked him if he could examine the vehicle. García–Robledo consented. A police woman handcuffed her and asked her to get out of the vehicle. García–Robledo was moved to the back part of the vehicle and the vehicle was searched by two agents opening the four (4) doors, searching underneath the seats throughout the entire vehicle. The search lasted twenty (20) to twenty five (25) minutes and Mrs. Marcano and García–Robledo were handcuffed. The agents were not dressed in police uniforms and she does not recall whether they were in an official police car. Mrs. Marcano stated that PROP Machuca was there but he was not the one who intervened with them. After the vehicle was searched, a police officer in uniform got into the vehicle and took the same. García–Robledo was put inside a patrol car and Mrs. Marcano was placed in another vehicle with a female police officer. The Ford F–250 traveled first, the patrol car in which García–Robledo was placed traveled second and the patrol car in which Mrs. Marcano was traveled last.

When they arrived at the San Juan Stolen Vehicles Division, the Ford F–250 vehicle was already parked there with the doors opened and they were taking García–Robledo out of the patrol car. Mrs. Marcano was taken out of the patrol car and she was taken upstairs along with García–Robledo. There were two (2) cells upstairs and Mrs. Marcano was placed in one cell and García–Robledo was placed in another cell. Mrs. Marcano and García–Robledo were both left inside the cells for a while, about eight (8) to nine (9) hours. After being about fifty (50) minutes inside the cell, several agents came upstairs and told García–Robledo they had found something in the vehicle. Then, one of the agents went to García–Robledo's cell to talk to him. One of the agents spoke to Mrs. Marcano in her cell, after being there for about two (2) hours, and asked her whether she knew anything which could "sink" García–Robledo, about their relationship, to where were they headed that day, and whether she had seen anything in the vehicle, to which she answered in the negative. The agent told her they had found drugs. When this was happening, García–Robledo was not in the other cell. Mrs. Marcano saw García–Robledo being taken out of his cell two (2) times.

On cross-examination, Mrs. Marcano stated they were stopped at the Bella International on 65th Infantry Road waiting for the light to change to green and then she heard someone say "pull over." García–Robledo was driving the vehicle and Mrs. Marcano did not know the vehicle which García–Robledo was driving was stolen. Mrs. Marcano testified she is not a police officer and she does not know anything about police procedure. There was another police officer who intervened with García–Robledo who was not PRPO Ma-

chuca. The other officer, who was not in uniform, is the one who asked García–Robledo for his diver's license and vehicle's registration and he was the one who arrested García–Robledo.

Mrs. Marcano could not see the Ford F–250 vehicle the whole time that it was being transferred to the San Juan Stolen Vehicles Division. Thus, Mrs. Marcano does not know how long the Ford F–250 vehicle was at the division before she got there. García–Robledo was already at the division outside the patrol car when she arrived. When Mrs. Marcano arrived at the division, she and García–Robledo were quickly taken upstairs. Mrs. Marcano was not with García–Robledo the whole time after they arrived at the division. Mrs. Marcano could not see García–Robledo because there was a wall between both cells. Mrs. Marcano stated that there was a door through which García–Robledo had to come in and out. At the moment Mrs. Marcano was taken upstairs with García–Robledo she knew he was there in the cell next to her but, after they took him away, she did not know where they took him. Mrs. Marcano testified García–Robledo was never downstairs with the vehicle when it was searched. Mrs. Marcano does not know when the canine unit arrived nor when the inventory search was done. Mrs. Marcano recognized García–Robledo's signature in Exhibits 1 and 3. Mrs. Marcano does not know when or where García–Robledo signed these documents. Mrs. Marcano knows the documents were not signed in the cell because she did not see anyone coming in with any documents. García–Robledo was taken out of his cell about two (2) or three (3) times. Mrs. Marcano does not know why García–Robledo was removed from his cell nor where he was taken.

On re-direct examination, Mrs. Marcano described that her cell was a little room with a door in the front. She could not see García–Robledo but she could touch him.

## LEGAL DISCUSSION

### I. Standing.

The government claims defendant García–Robledo does not have standing to challenge the narcotics seized from the Ford F–250 vehicle he was driving because, as the driver of a stolen vehicle which belonged to a third party, he had no reasonable expectation of privacy in the Ford F–250. Moreover, the government avers the vehicle's registration was fabricated and it did not match the vehicle's sticker ("marbete"). On the other hand, García–Robledo claims he has standing because he bought the Ford F–250 several days prior to the date of his arrest and, thus, had a reasonable expectation of privacy in said vehicle.

The concept of standing under the Fourth Amendment refers to the defendant's burden of proving a legitimate expectation of privacy as a prerequisite to challenge unlawful police conduct. *United States v. Sánchez*, 943 F.2d 110, 113 n. 1 (1st Cir.1991). "We therefore use the term 'standing' somewhat imprecisely to refer to this threshold substantive determination." *Id. See United States v. Cruz Jiménez*, 894 F.2d 1, 5 n. 1 (1st Cir.1990).

The term "standing" is also used as a shorthand method of referring to the issue of whether the defendant's own Fourth Amendment interests were implicated by the challenged governmental action. "Technically, the concept of 'standing' has not had a place in Fourth Amendment jurisprudence for more than a decade, since the Supreme Court in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), indicated that matters of standing in the context of searches and seizures actually involved substantive

Fourth Amendment law." *See Sánchez,* 943 F.2d at 113 n. 1; *see also United States v. Kimball,* 25 F.3d 1, 5 (1st Cir. 1994).

■■ A defendant has the burden of establishing standing. *Rakas,* 439 U.S. at 138–48, 99 S.Ct. 421; *United States v. Melucci,* 888 F.2d 200, 201 (1st Cir.1989); *United States v. Hershenow,* 680 F.2d 847, 855 (1st Cir.1982). Defendant's burden of showing that he had reasonable expectation of privacy in the area searched and in relation to the items seized in order to establish standing for suppression challenge must be carried at the time of the pretrial hearing and on the record compiled at that hearing. *Aguirre,* 839 F.2d at 856; *and see United States v. Mancini,* 8 F.3d 104, 107 (1st Cir.1993) (before embarking upon the merits of a suppression challenge, a criminal defendant must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized).

■■ The First Circuit has identified the sort of factors which are pertinent to this threshold inquiry: ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case. *Aguirre,* 839

F.2d at 857; *see, e.g., United States v. Gómez,* 770 F.2d 251, 254 (1st Cir.1985); *United States v. Lochan,* 674 F.2d 960, 965 (1st Cir.1982).[3] The Court looks to whether or not the individual thought of the place (or the article) as a private one, and treated it as such. If the movant satisfies the Court on this score, then the Court looks to whether or not the individual's expectation of confidentiality was justifiable under the attendant circumstances. Whatever facts may shed light upon either step of this two-tier inquiry may be weighed in the balance. *Aguirre,* 839 F.2d at 857.

While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, *United States v. Salvucci,* 448 U.S. 83, 91, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980), ownership alone is not dispositive. *Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980). Courts must look to the totality of the circumstances, and "any precautions taken to exclude others or otherwise maintain a privacy interest will heighten the legitimate expectation of privacy in the protected area." *United States v. One 1977 Mercedes Benz,* 708 F.2d 444, 449 (9th Cir. 1983).

García–Robledo testified at the suppression hearing only as to the standing issue.[4]

---

3. The factors that a court must take into account prior to deciding whether the defendant requesting the suppression had the expectation of privacy that grants him/her the standing to request the suppression include: 1) legitimate presence in the area searched; 2) prior use of the area searched or the property seized; 3) possession or ownership of the area searched or the property seized; 4) ability to control or exclude other's use of the property; and 5) a subjective expectation of privacy. *Lochan,* 674 F.2d at 965.

4. One should not lose sight of the fact that "it has been well settled for over twenty years that testimony given to meet standing requirements cannot be used as direct evidence against the defendant at trial on the question of guilt or innocence." *United States v. García–Rosa,* 876 F.2d 209, 219 (1st Cir.1989) *(citing Simmons v. United States,* 390 U.S. 377, 390, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247 (1968)). Thus, a defendant should have no prejudicial consequence in admitting ownership of the drug or portions thereof to sustain

Based on García–Robledo's testimony, we conclude he has standing to challenge the seizure of the narcotics under the totality of the circumstances and the evidence before the Court. Accordingly, García–Robledo has met the threshold established in *Aguirre* and *Lochan.*

García–Robledo uncontested testimony shows he bought the Ford F–250 vehicle from Josué LNU at a business in Road # 1 in Caguas five (5) days before August 6, 2006 and he paid $5,000.00 in addition to trading in a 1986 or 1987 Toyota Corolla. García–Robledo was handed a set of keys by Josué and García–Robledo used the vehicle on a daily basis to go to work and move around the area where he lived after he purchased the same. No one else used the Ford F–250 vehicle besides García–Robledo and he was the driver when the vehicle was pulled over by the PRPOs on August 6, 2006. García–Robledo reviewed the vehicle's registration and the sticker ("marbete") and everything seemed to be fine. García–Robledo was to receive from Josué in two (2) weeks the bank's payment booklet with its coupons, the promissory note and the original vehicle's registration. The Ford F–250 could not be transferred to García–Robledo's name because his credit was compromised due to another vehicle loan. Nonetheless, García–Robledo was going to make the payments for the Ford F–250 vehicle.

We note García–Robledo has never disclaimed ownership of the Ford F–250. In fact, since García–Robledo's arrest he has claimed a property and possessory interest of the vehicle. Evidence of this is the written statement provided by him on the day of his arrest, at the agent's invitation, which shows he bought the vehicle several days prior the incident for $5,000.00 in addition to trading in the Toyota Corolla. See Exhibit 1. Thus, García–Robledo's de-

tailed testimony is consistent and is corroborated by the written statement provided by him the day of his arrest. See Exhibit 1.

Thus, in view of the above, García–Robledo had a legitimate presence in the vehicle, had prior use of the vehicle, was in control of the Ford F–250 the day of the incident, was in possession of the vehicle, and had the ability to exclude others use of the property.

In turn, the government contends the vehicle in question was reported stolen in April 2006 and, thus, García–Robledo had no reasonable expectation of privacy. Nonetheless, no credible evidence was presented that García–Robledo had any knowledge at the time he purchased the vehicle that the Ford F–250 vehicle was stolen.

Although the manner in which García–Robledo bought the car may be unconventional, inasmuch the vehicle's registration was not promptly transferred to his name, García–Robledo provided a credible explanation as to why this was not done. García–Robledo explained he would not qualify for a loan of the Ford F–250 vehicle or to assume the lease because his credit was not enough. To this effect, García–Robledo explained he had another loan for a 2004 Nissan Titan pick-up truck for which he paid $751.00 monthly. He gave a $5,000.00 down payment and the pick-up value was approximately $45,000.00. Thus, the transfer of the Ford F–250 vehicle to his name was not viable.

The government also avers the vehicle's registration was fabricated because the date of expiration on the registration did not match the date of expiration on the sticker ("marbete"). Upon being questioned as to this matter, García–Robledo

standing to contest its seizure under Fourth Amendment grounds.

indicated he did not notice the discrepancy. García–Robledo only verified whether the VIN number and whether the number of the sticker matched the one on the registration and everything seemed fine to him. No evidence was presented by the government to contradict García–Robledo's testimony that he did not notice the above discrepancy.

The government relies on *United States v. Haywood*, 324 F.3d 514 (7th Cir.2003) to support its claim that García–Robledo lacks standing because he was not authorized to drive the vehicle by anyone with a legitimate interest in the Ford F–250. In *Haywood*, the Seventh Circuit concluded that, where the driver lacks a valid license, the rental company would not have granted permission to use the vehicle, and there is no expectation of privacy. Thus, an unlicensed driver of a rental car had no reasonable expectation of privacy in the car and, therefore, lacked standing to object to the officer's search of the car.

*Haywood* is distinguishable from the facts of this case because in *Haywood* the vehicle at issue was a rented vehicle which was rented to the defendant's girlfriend who had given defendant permission to drive the same. Thus, defendant in *Haywood* was a non-authorized driver of a rental car and was an unlicensed one as well. That is not the case at hand. Pursuant to García–Robledo's uncontested testimony, he purchased the vehicle and was, thus, authorized to drive the same. Therefore, no rental vehicle is at issue.

Pursuant to the averments made by Josué to García–Robledo, it was reasonable for García–Robledo to believe Josué was the authorized person in possession of the Ford F–250. Evidence of this is the uncontested fact that García–Robledo paid Josué $5,000.00 for the Ford F–250, traded in the Toyota Corolla, received a set of keys from Josué, acquired possession of the vehicle from Josué, agreed to continue making the payments of the vehicle to the bank upon receipt of the payment booklet, and was going to receive the original registration papers from Josué. Thus, unlike the facts in *Haywood*, in which the driver did not show any possessory or ownership right on the vehicle, García–Robledo made a reasonable payment for the vehicle, had legitimate control of the same and, thus, had a legitimate right to believe that he had legally bought the Ford F–250 and was in its rightful possession.

The government also contends the rightful owner of the Ford F–250 in this case was First Leasing because the vehicle was leased. As to a possible leasing, García–Robledo testified First Leasing is the vehicle's owner pursuant to the information contained in the vehicle's registration (Exhibit A). Thus, Josué may have had a lease for the vehicle with First Leasing. García–Robledo stated he did not know what a lease was but he was willing to take the car because he had heard that, after a period of time, he could keep the vehicle or trade it in. Thus, at the time García–Robledo purchased the Ford F–250 vehicle he was not sure how a lease worked.

Pursuant to Exhibit A, the owner of the Ford F–250 was First Leasing and García–Robledo was not authorized by First Leasing to drive the vehicle. Nonetheless, no evidence was introduced at the suppression hearing to show there was in fact a lease agreement between First Leasing and Josué. Assuming for the sake of the argument there was in fact a lease agreement between Josué and First Leasing, First Leasing owned the vehicle and Josué should have been the only person authorized under the lease agreement to drive the vehicle.

A defendant must present at least some evidence of consent or permission from the lawful owner/renter to give rise to an ob-

jectively reasonable expectation of privacy. *See United States v. Gómez,* 16 F.3d 254, 256 (8th Cir.1994); *United States v. Rose,* 731 F.2d 1337, 1343 (8th Cir.1984). Based on our review of the record, García–Robledo has presented direct evidence that Josué granted him permission to use the vehicle. Moreover, the evidence presented gives rise to an inference of consensual possession of the vehicle because, pursuant to the unchallenged testimony of García–Robledo, Josué handed him a set of keys upon payment being made under the premise that the original registration of the vehicle and the payment booklet were going to be provided to García–Robledo in two (2) weeks. Josué's actions establish he acquiesced and authorized García–Robledo to drive the vehicle. Thus, García–Robledo has demonstrated "a more intimate relationship with the car's owner or a history of regular use of the [car]." *United States v. Sánchez,* 943 F.2d 110, 114 (1st Cir.1991).

In view of the above, García–Robledo's testimony at the suppression hearing, under the totality of the circumstances, show he had a legitimate presence in the vehicle; had prior use of the vehicle; was in control of the Ford F–250 the day of the incident and six (6) day prior, was in possession of the vehicle; had the ability to exclude others use of the property and had a reasonable expectation of privacy. *Lochan,* 674 F.2d at 965.

As such, García–Robledo has standing to challenge the seizure of the narcotics under the totality of the circumstances and the evidence before the Court.

## II. Investigatory Stop based on Reasonable Suspicion.

Defendant García–Robledo claims the stop of the Ford F–250 vehicle was unconstitutional because the PRPOs did not have probable cause to believe that a traffic violation had occurred.

An investigative stop, also known as a *Terry* stop, see *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), occurs when a police officer, acting on reasonable and articulable suspicion of criminal activity, briefly detains an individual to confirm or dispel his suspicion. *Id.* at 6, 88 S.Ct. 1868 (citing *United States v. McCarthy,* 77 F.3d 522, 529 (1st Cir.1996)).

■ With regards to investigative stops, the Court must determine "not whether the police had probable cause to act, but instead whether the actions taken were reasonable under the circumstances." *Id.* The Court must first conclude whether the officer's action was justified at its inception. If the action is justified, the Court must then ask whether the action taken was reasonably related in scope to the circumstances which justified the interference. *Id.* To satisfy the first prong, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Young,* 105 F.3d 1, 7 (1st Cir.1997) (citing *United States v. Kimball,* 25 F.3d 1, 6 (1st Cir.1994)). To fulfill the second prong, the Court must examine the totality of the circumstances. *See United States v. Walker,* 924 F.2d 1, 4 (1st Cir.1991); *see also United States Acosta–Colón,* 157 F.3d 9, 14 (1st Cir. 1998).

■ Based on the abovementioned case law, we conclude the PRPOs had reasonable suspicion to conduct an investigatory stop of García–Robledo's Ford F–250 vehicle. Accordingly, the investigatory stop was legal. We explain.

PRPO Machuca, with nine (9) years of experience as an investigating agent for the Puerto Rico Police Department's San

Juan Stolen Vehicles Division, in pertinent part testified that on August 6, 2006 he was driving on 65th Infantry Avenue on the way to Río Piedras, along with fellow PRPO Serrano, in a marked patrol vehicle. When they got to the Juan Peña Reyes Street, PPRO Machuca noticed a brown King Ranch model Ford F–250 drive through the traffic red light at Juan Peña Reyes Street. PRPOs Machuca and Serrano turned on the flashing lights and the siren of the patrol car, went through the traffic light with all due precautions until they caught up with the vehicle and ordered the vehicle to stop. PRPO Machuca then radioed to the Command Center the vehicle's license plate number where the number was ran in the computer system. The duty officer at the Command Center replied the license plate was showing as a lost plate from Eurobank. PRPO Machuca got out of the patrol car, approached the driver's area and requested the driver's license and the vehicle's registration.

Defendant García–Robledo has failed to offer any proof to contest the validity of the traffic stop. No credible evidence has been presented by defendant to show that he did not commit the traffic violation. Defendant relies on argument of counsel in the Motion to Suppress that defendant was not even issued a traffic ticket for the red light which allegedly gave the PRPOs the probable cause to detain him. (Docket No. 17, p. 4). Nonetheless, this argument is directly contradicted by the documentary evidence presented at the hearing which included a copy of the traffic ticket which was issued to García–Robledo on August 6, 2006 which was admitted as Exhibit 2 for passing a red traffic light without stopping. PRPO Machuca testified to this effect that Exhibit 2 was a photocopy of the traffic ticket he issued García–Robledo the date of the incident which bears PPRO Machuca's signature and badge number. PRPO Machuca testified he prepared the

ticket later on at the division when they arrived. PRPO Machuca did not have García–Robledo sign the traffic ticket at the space entitled "violator's signature" because he refused to sign it. The original traffic ticket was provided to García–Robledo along with a copy of the PPR–128. The ticket was issued from PRPO Machuca's ticket booklet which is assigned to him and which he carries when he goes out to investigate. In view of the foregoing, it is undisputed defendant García–Robledo made a traffic violation, ran a red light, which was observed by the PRPOs. Accordingly, given the totality of the circumstances surrounding the initial investigatory stop of defendant as above summarized, we conclude the PRPOs had sufficient reasonable suspicion to make the initial stop of the Ford F–250 vehicle García–Robledo was driving on August 6, 2006.

### III. Warrantless Arrest.

■ A warrantless arrest is constitutionally valid if, at moment arrest is made, officers have probable cause to make it, that is, if at that moment facts and circumstances within their knowledge and of which they had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense. *United States v. Ayres*, 725 F.2d 806 (1st Cir.1984); *United States v. Young*, 105 F.3d 1, 6 (1st Cir.1997) (same). Whether there is probable cause for a warrantless arrest is determined under an objective standard, not by inquiry into officers' presumed motives. *Id.*

Probable cause "is a practical, nontechnical conception" offering an acceptable compromise between competing societal interests in protecting citizens on the one hand from abusive interferences with privacy and unfounded charges of crime and on the other hand in recognizing the ne-

cessity to afford "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

A warrantless arrest requires probable cause, the existence of which must be determined in light of the information that law enforcement officials possessed at the time of the arrest. *See United States v. Diallo,* 29 F.3d 23, 25 (1st Cir.1994). To establish probable cause, the government "need not present the quantum of proof necessary to convict." *United States v. Uricoechea–Casallas,* 946 F.2d 162, 165 (1st Cir.1991); *United States v. Meade,* 110 F.3d 190, 193 (1st Cir.1997).

The inquiry into probable cause focuses on what the officer knew at the time of the arrest, *United States v. Brown,* 169 F.3d 89, 91 (1st Cir.1999), and should evaluate the totality of the circumstances. *United States v. Reyes,* 225 F.3d 71, 75 (1st Cir. 2000). "[P]robable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Meade,* 110 F.3d at 198 n. 11; *United States v. Vongkaysone,* 434 F.3d 68, 73 (1st Cir.2006).

After evaluating the testimony of PRPO Machuca and Mrs. Marcano, including their responsiveness and their demeanor on the stand, and the documentary evidence presented at the evidentiary hearing, this Magistrate Judge finds, pursuant to the preponderance of the evidence and considering the totality of the circumstances, the account of PRPO Machuca to be credible and accords little weight to Mrs. Marcano's testimony under these circumstances.

■ Applying the above case law to this case, we conclude defendant García–Robledo's arrest after the investigatory stop was lawful and based on probable cause. Pursuant to the testimony of PRPO Machuca, while conducting the investigatory stop after the vehicle was ordered to stop and before placing defendant García–Robledo under arrest, PRPO Machuca radioed the license plate to the Command Center where it was ran. The duty officer at the Command Center replied that the license plate was showing as a lost plate from Eurobank. PRPO Machuca got out of the patrol car, approached the area of the driver and requested the driver's license and the vehicle's registration. The first thing that caught the eye of PRPO Machuca, after seeing the vehicle's registration, was that the vehicle was under the name of First Leasing as shown by the vehicle's registration and the license plate in the vehicle was registered to Eurobank. In addition, PRPO Machuca noticed the duties stamp at the bottom said "SJ 18." The "SJ 18" was discontinued by the Public Works Department because it was lost. Thus, the "SJ 18" stamp is no longer in use. PRPO Machuca also noticed that at the bottom of the vehicle's registration, it stated a number starting with "4004" and we have not gotten to the year 4004. If the vehicle's registration were to be valid, it would first give the year, then the month and then the day it was issued by Public Works Department. Thus, PRPO Machuca concluded the vehicle's registration was altered, false, falsified or forged. After PRPO Machuca saw the vehicle's registration, the VIN number was ran at the Command Center and it came back with a stolen vehicle lien or hold. Thus, PRPO Machuca believed the vehicle was stolen. Then, García–Robledo and his wife were placed under arrest, PRPO Machuca read to García–Robledo his rights and then proceeded to search him for García–Robledo's safety and that of the officer. A surface check was done of the vehicle at the scene

to make sure there was no property belonging to the occupants. Nothing was seized at that time.

The defense attempted to impeach PRPO Machuca's testimony by the testimony of Mrs. Marcano in which she stated that PRPO Machuca was not the officer who intervened with them on August 6, 2006. Even if we take Mrs. Marcano's testimony as true, we would reach the same conclusion because, regardless of who in fact intervened with García–Robledo and Mrs. Marcano on August 6, 2006, the defense has failed to present credible evidence to contradict the government's evidence that there was reasonable suspicion for the investigatory stop and probable cause for the warrantless arrest. For example, no credible evidence was presented by the defense that the traffic violation did not occur, that the license plates were not lost and that the vehicle's registration was not false.

In view of the foregoing, the decision to place García–Robledo under arrest and take him to the San Juan Stolen Vehicles Division was objectively reasonable because, in PRPO Machuca's experience, he believed the vehicle's registration was false, the license plates showed as lost, the vehicle showed as stolen and the vehicle was not registered under the driver's name. Thus, under these circumstances, there was probable cause for García–Robledo's warrantless arrest.

### IV. Inventory Search.

Defendant García–Robledo further avers the search of the Ford F–250 vehicle at the San Juan Stolen Vehicles Division was outside the parameters of an administrative search making it unreasonable. In turn, the government claims in its Opposition the inventory search was legally performed following the PRPD's standard procedure and regulations.

Following an arrest, the vehicle and all its contents and containers are lawfully subject to search. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). That is, if "probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its content that may conceal the object of the search." *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

It is common practice for the police to conduct an inventory of the contents of vehicles they have taken into their custody or are about to impound. Wayne R. LaFave, *Search and Seizure* § 7.4 at 536 (3d ed. 1996 & Supp.2003). Such inventories "are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine,* 479 U.S. 367, 371, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). They are not treated as investigative searches because they serve three administrative purposes: "the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger." *South Dakota v. Opperman,* 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Tueller,* 349 F.3d 1239, 1243 (10th Cir.2003); *United States v. Haro–Salcedo,* 107 F.3d 769, 772 (10th Cir.1997).

An inventory search of an automobile is permitted where the police have lawfully impounded the automobile and the police have acted in accordance with reasonable, standard policy of routinely securing and inventorying contents of the impounded vehicle. To be permissible under the Fourth Amendment, warrantless inventory searches must be conducted according to standardized procedures. *Opperman,* 428 U.S. at 372–75,

96 S.Ct. 3092; *Bertine,* 479 U.S. at 374 n. 6, 107 S.Ct. 738; *Florida v. Wells,* 495 U.S. 1, 4–5, 110 S.Ct. 1632, 1635–36, 109 L.Ed.2d 1 (1990). Any "discretion [must be] exercised according to standard criteria and on the basis of something other than suspicion of criminal activity." *Bertine,* 479 U.S. at 375, 107 S.Ct. 738; *United States v. Infante–Ruiz,* 13 F.3d 498, 503 (1st Cir.1994).

Generally, "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment." *United States v. Richardson,* 121 F.3d 1051, 1055 (7th Cir.1997) (quoting *Bertine,* 479 U.S. at 374, 107 S.Ct. 738); *United States v. Lumpkin,* 159 F.3d 983 (6th Cir.1998).

■ The Government in this case attempts to justify the validity of the search as an inventory search. The First Circuit has decided that such claim requires definite proof that the evidence would have been admitted regardless of any overreaching. *Infante–Ruiz,* 13 F.3d at 503–04. The Government bears the burden of showing by reference to the facts that the items would have been inevitably discovered. In addition, to be permissible under the Fourth Amendment, warrantless inventory searches must be conducted according to standardized objective procedures. *Infante–Ruiz,* 13 F.3d at 503. Any discretion must be exercised according to standard objective criteria and on the basis of something other than suspicion.

Nonetheless, courts have regularly approved inventory searches of impounded motor vehicles despite the absence of probable cause, *see, e.g., Bertine,* 479 U.S. at 371, 107 S.Ct. 738; *United States v. Ramos–Morales,* 981 F.2d 625, 626 (1st Cir.1992) (collecting cases); *United States v. Rodríguez–Morales,* 929 F.2d 780, 785 (1st Cir.1991); *United States v. Trullo,* 790 F.2d 205, 206 (1st Cir.1986), and, by like token, courts often have held that evidence which would have turned up during an inventory search comes under the umbrella of the inevitable discovery rule, *see, e.g., United States v. Seals,* 987 F.2d 1102,-1107–08 (5th Cir.1993); *United States v. Horn,* 970 F.2d 728, 732 (10th Cir.1992); *United States v. Williams,* 936 F.2d 1243, 1248–49 (11th Cir.1991); *United States v. Mancera–Londono,* 912 F.2d 373, 375–76 (9th Cir.1990); *United States v. Arango,* 879 F.2d 1501, 1507 n. 2 (7th Cir.1989); *see also United States v. George,* 971 F.2d 1113, 1121 (4th Cir.1992) (agreeing in theory); *United States v. Jenkins,* 876 F.2d 1085, 1088 (2d Cir.1989) (same); *United States v. Zapata,* 18 F.3d 971, 978–979 (1st Cir.1994).

■ The Government in this case met its burden by introducing evidence by the testimony of PRPO Machuca that the actions of the PRPOs were controlled by established procedures and standardized criteria of the PRPD as required by Supreme Court case law. *See Florida v. Wells,* 495 U.S. at 4–5, 110 S.Ct. 1632; *Bertine,* 479 U.S. at 374 n. 6, 107 S.Ct. 738; *Opperman,* 428 U.S. at 372–75, 96 S.Ct. 3092; *Infante–Ruiz,* 13 F.3d at 503. In fact, the documents submitted with the government's opposition to the motion to suppress support the testimony of PRPO Machuca. The government submitted PRPD General Order No. 83–12 which establishes police procedures for the recovery of stolen vehicles. Section "VII" states that an inventory search be taken of all property found in recovered stolen vehicles and that form PPR–128 shall be completed by the officer conducting the inventory. (Docket No. 19, p. 10, Attachment "J").

In the instant case, once at the San Juan Stolen Vehicles Division, PRPOs Machuca and Serrano proceeded to conduct an in-

ventory search of the vehicle in the presence of García–Robledo. An inventory search of the vehicle was done because the vehicle at issue was a stolen vehicle and there is a PRPD regulation that requires an inventory in order to safeguard the people's property. At that time, PRPO Machuca did not suspect the driver of having committed any other violation other than what he was arrested for. Thus, no ulterior motive was present for the PRPOs to conduct the inventory search.

While the inventory search was being conducted in the presence of García–Robledo on the back seat on the left, they found a red bag. Inside the red bag, there was a yellow bag, and inside the yellow bag there were like two bricks or two packages shaped like bricks. At that point in time, PRPO Machuca did not know what those packages were. A canine unit was called as part of the standard procedure when something is found inside a vehicle with which the agents are not familiar. García–Robledo was present when the two (2) packages were found. An hour later, an officer arrived with the canine unit and he walked the canine unit around the vehicle. After the canine unit verified the surrounding area of the vehicle, then the vehicle was opened up and the canine unit verified inside the vehicle. The canine unit stood on the back part of the vehicle on the left hand side because it was marking that there could be possible controlled substances. The red bag was found in the left side of the back seat, that is the back panel of the second row of seats of the pick-up inside the cab area. Behind the back seat of these vehicles there is a small space containing a wrench to change the bolts on the tires and there is the metal rod used to lift the car to change a tire.

After the canine unit verified the vehicle, PRPO Machuca took García–Robledo to the interview area where he again was read his rights, which he signed and initialed. No credible evidence was presented by the defense to establish the procedure followed in this case with the canine unit was irregular and not proper within the standard procedure.

On cross-examination, defense counsel tried to impeach PRPO Machuca because some parts of the PPR–128 were not filled out, including the "cotejo de llegada a la unidad policiaca." See Exhibit 3.[5] A review of PPR–128 used in this case shows that in fact several spaces on the form were not filled out. Nonetheless, a review of the whole PPR–128 demonstrates it was filled out almost in its entirety including the most important parts to fulfill its main purpose of performing an inventory of the seized vehicle, to wit, "Equipment and Accessories." Also, the PPR–128 was signed by PRPO Machuca and defendant García–Robledo and it was dated. In addition, we note the spaces which were left in blank were not purposely omitted. PRPO Machuca testified that part of the PPR–128 has to be certified and filled out by the person in charge of the vehicle within the division but that person was not present there at the time. Thus, that part was not filled out. The part that says "cotejo de salida o entrega" was filled out a few days later. Accordingly, a reasonable explanation was provided. Moreover, Exhibit 3 was admitted without objection from defense counsel after it was established that it was signed by PRPO Machuca. (Suppression Hearing Transcript, 1/9/07, p. 24). Thus, the fact that some parts of the PPR–128 were left blank is inconsequential and would not have changed our recommenda-

---

**5.** PRPO Machuca identified a photocopy of the PPR–128 form which is the inventory of the vehicle which was written in his handwriting and on the second page there is his signature and badge number. The PPR 128 was admitted as Exhibit 3.

tion in this case. No credible evidence was presented at the hearing to show that the PRPOs did not follow the PRPD General Order No. 83–12 which establishes police procedures for the recovery of stolen vehicles. (Docket No. 19, p. 10, Attachment "J").

Furthermore, the defense did not present any credible evidence to contest the fact that the inventory search was done in the presence of García–Robledo. Even though Mrs. Marcano testified that she was in cell next to her husband while they were at the police station and he was not present when the inventory search of the Ford F–250 was done, she had no knowledge why García–Robledo was removed from his cell. Moreover, Mrs. Marcano recognized she did not know where García–Robledo was taken when he was removed from his cell on several occasions. In addition, in cross-examination, Mrs. Marcano admitted not knowing when the inventory search was done.

Finally, we note that no credible evidence was introduced by defendant to show the PRPOs acted in bad faith for the sole purpose of investigation in conducting the inventory search of his vehicle. *Bertine*, 479 U.S. at 367, 107 S.Ct. 738.

In view of the foregoing, the inventory search of the Ford F–250 vehicle in this case was lawful and in accordance with the PRPD's standard procedures.

### CONCLUSION

Based on the witnesses' testimony at the suppression hearing, including the testimony of PRPO Machuca and of Mrs. Marcano, and having assessed their credibility and taking into account the documentary evidence also presented, it is determined that, pursuant to the preponderance of the evidence and considering the totality of the circumstances, García–Robledo has standing for the suppression of the evidence seized, there was reasonable suspicion for the initial stop of the Ford F–250 vehicle, there was probable cause for the subsequent inventory search of the vehicle and the arrest of defendant García–Robledo, and thus consonant with its admissibility under the above findings and applicable law.

In view of the foregoing, it is recommended that García–Robledo's Motion to Suppress (Docket No. 17) be DENIED.

IT IS SO RECOMMENDED.

The parties have ten (10) days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this order. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–151 (1st Cir.1994); *United States v. Valencia–Copete*, 792 F.2d 4 (1st Cir.1986). See *Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir.1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round").